PEOPLE v JAMIESON

Docket No. 83446. Argued April 4, 1990 (Calendar No. 9). Decided
September 12, 1990.

Stephen Jamieson, William Moore, Vincent McFadden, Gregory
Union, and James Neely, Wayne County Jail guards, were
charged in the Detroit Recorder's Court with delivery of co-
caine following an undercover operation by the Wayne County
Sheriff's Department in which the delivery was made to a
teenage informant-inmate of the jail. The court, Michael F.
Sapala, J., dismissed the charges, finding as a matter of law,
that the defendants were entrapped. The Court of Appeals,
D. E. HOLBROOK, JR., P.J., and SHEPHERD and D. L. SULLIVAN,
JJ., affirmed in an opinion per curiam, concluding that the trial
court's decision was not clearly erroneous (Docket No. 92614).
The people appeal.

In an opinion by Justice BRICKLEY, joined by Chief Justice
RILEY and Justice BOYLE, and an opinion by Justice CAVANAGH,
the Supreme Court *held*:

The defendants were not entrapped. The conduct of the police
did not amount to governmental manufacturing or inducement
of criminal behavior, but served only to provide the defendants
an opportunity to engage in criminal activity.

1. The defense of entrapment in criminal cases is intended to
prevent government conduct in instigating criminal activity. In
determining whether entrapment has occurred, courts have
employed both objective and subjective tests. The subjective test
focuses on the defendant's predisposition to commit the crime:
the knowing commission of an act that the law forbids, a
purposeful intention to violate the law. The objective test
focuses on the conduct of the law enforcement officers rather
than the defendant's state of mind: whether the conduct of the
officers went beyond merely creating an opportunity for the
commission of the crime so as to actually instigate the crime.
Although in many instances the application of the two theories
overlap, Michigan's commitment to the objective test has not

REFERENCES

Am Jur 2d, Evidence § 1160.
See the Index to Annotations under Entrapment.

been so undermined by time or circumstances that it should be discarded.

2. To determine whether entrapment has been established, a distinction is made between traps for unwary innocents and traps for unwary criminals. There is no entrapment where police merely furnish an opportunity for the commission of a crime to a person ready and willing to commit the act. Rather, government agents must act in a way likely to instigate or create a criminal offense, e.g., by appealing to a person to commit the act because of friendship or sympathy, rather than for personal gain; by using an inducement that would make commission of the crime unusually attractive to a normal law-abiding person; by guaranteeing that the act was not illegal; and by offering exuberant consideration or similar enticement.

3. In this case, while the undercover procedures employed by the government may not have been the only or most desirable methods to control drug trafficking in the prison, that is an insufficient basis to support a finding of entrapment. Use of a sixteen-year-old, convicted as an adult and incarcerated in an adult prison, as an informer in a one-time transaction involving limited contact was not improper. No friendship or sympathy was used to lure the defendants into criminal activity, and the plan was formulated outside the jail and outside the control and influence of the informant. The mere fact that the government furnished a necessary element of the criminal transaction, the drugs, is only one factor relevant to the entrapment analysis, and does not require a finding of entrapment per se. The provision of actual contraband is an example of an investigative technique that responds to the particular nature of this type of crime.

4. Where an accused claims entrapment, the trial court must conduct a separate evidentiary hearing, with the defendant bearing the burden of proving by a preponderance of the evidence that the law enforcement officials engaged in reprehensible behavior. The facts of each case must be examined to determine whether, under the circumstances, the governmental activity would have induced a hypothetical person not ready and willing to commit the crime to engage in criminal activity; the trial court's findings on the issue are subject to appellate review under the clearly erroneous standard. In this case, the informant approached the Sheriff's Department. The police did not seek out informants for the purpose of developing criminal activity, but merely decided to act upon information received from the inmate. The furnishing of contraband by the government is insufficient to instigate or induce the commission of a

crime by an average person, similarly situated to the defendants in this case, who is not ready and willing to commit it.

Justice CAVANAGH, concurring in the result, stated that the term "ready and willing to commit the crime" does not necessarily require that a court applying the objective test look to the state of mind of the accused. The defense of entrapment is available even to defendants who were ready and willing to commit a crime, as long as the conduct of the government failed to comport with a fair and honorable administration of justice. The dispositive inquiry under the objective test is not whether the crime was caused by, or was the product of, the creative activity of law enforcement officials, but whether it was committed at the instigation of reprehensible police conduct. Affording a person an opportunity to commit an offense does not ordinarily constitute entrapment unless the circumstances indicate that such an opportunity would not normally be presented, or the mere furnishing of the opportunity required the police to commit certain criminal, dangerous, or immoral acts. Prosecution of guards trafficking in drugs should be permitted where the government supplied contraband to a jail or prison guard to be delivered to an inmate inside a correctional facility. Given the uniqueness of the crime and its setting in this case, there was a special need for the government to provide the contraband; and given the controlled setting in which the undercover sales took place, the unsupervised activity of the informant did not present dangers that made the police action reprehensible.

Justice LEVIN concurred in the adherence to the objective theory of entrapment and in the reversal. Having in mind that prisoners are not at liberty to communicate with authorities or persons in the free world without running the risk of detection, and that they are vulnerable to oppression by their overseers and other inmates, methods that would be unacceptable in other settings are tolerable to root out venality in a prison setting.

Justice GRIFFIN, concurring in part and dissenting in part, stated that unless police conduct is so reprehensible as to violate the Due Process Clause, a criminal should not be exonerated by the judiciary because it disapproves of the conduct. Short of eliminating the defense of entrapment, the standard for judging entrapment should at least be the subjective standard. But because the Supreme Court persists in using an objective test, the version articulated in the lead opinion should be applied.

Reversed.

Justice Archer, dissenting, stated that while entrapment should be determined by applying an objective standard, the trial court in this case did not clearly err in ruling that the police officer's conduct entrapped these defendants. The defendants were merely conduits for drugs supplied by and delivered to the government in an undercover scheme in which the police introduced actual narcotics into the jail and in which a sixteen-year-old felon was allowed to select the targets of the scheme regardless of any reasonable suspicion with regard to any particular defendant. In reaching its decision, the trial court relied upon binding precedent firmly in line with the decisions of other jurisdictions.

168 Mich App 332; 423 NW2d 655 (1988) reversed.

1. Criminal Law — Entrapment — Burden of Proof — Standard of Review.

Where an accused claims entrapment, the trial court must conduct a separate evidentiary hearing, with the defendant bearing the burden of proving by a preponderance of the evidence that the law enforcement officials engaged in reprehensible behavior; the facts of each case must be examined to determine whether, under the circumstances, the governmental activity would have induced a hypothetical person not ready and willing to commit the crime to engage in criminal activity; the trial court's findings on the issue are subject to appellate review under the clearly erroneous standard.

2. Criminal Law — Entrapment — Contraband.

The fact that the government supplied contraband later sold by a defendant is only one factor relevant to an entrapment analysis.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Criminal Division, Research, Training and Appeals, and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people.

*Nicholas Smith, P.C.* (by *Nicholas Smith* and *Thomas V. Wilhelm*), for defendant Jamieson.

*Steven Fishman* for defendant Moore.

*Elizabeth L. Jacobs* for defendant McFadden.

*Felice V. Iafrate (Jerald R. Lovell,* of counsel), for defendant Neely.

*John R. Minock* for defendant Union.

Amici Curiae:

*Dorean M. Koenig* for the American Civil Liberties Union.

*Charles J. Booker,* Assistant Defender, for the Criminal Defense Attorneys of Michigan and the State Appellate Defender Office.

*Carl J. Marlinga,* Prosecuting Attorney, and *Laura Z. Dyze,* Assistant Prosecuting Attorney, for the Prosecuting Attorneys Association of Michigan.

BRICKLEY, J. We granted leave in this case to consider "whether the trial court clearly erred in dismissing on the basis of entrapment the charges of unlawful delivery of controlled substances that were brought against defendants." 431 Mich 906 (1988). We subsequently directed the parties to submit supplemental briefs with regard to whether we should abandon the objective entrapment test in preference to the subjective test. 433 Mich 1226 (1989). We have concluded that there is not sufficient justification or need to change a well-settled principle of law in this state. On the basis of the objective test, we would reverse the decisions of the lower courts in this case and hold, as·a matter of law, that defendants were not entrapped.

I

Defendants, all Wayne County Jail guards, were

charged with delivery of cocaine[1] following an undercover operation in which the delivery was made to an informant. The Wayne County Sheriff's Department was contacted by a juvenile inmate at Wayne County Jail, Quinton Varner, concerning deputy sheriffs smuggling narcotics to inmates. While the testimony suggests that Varner furnished the government with "a couple" of names, he did not provide information which would allow the sheriff's department to accumulate a list of specific targets.

Following discussions with the jail administrator and the Wayne County Prosecutor's Office, Sergeant Booth was allowed ten days "to work a scheme" that would unveil guards who were participating in the unlawful delivery of narcotics into the jail. After considering other alternatives, the operation was instituted. Varner offered to coöperate with the sheriff's department in exchange for a thirty-day reduction in his sentence.

Sergeant Booth obtained a supply of cocaine and money from the United States Government Drug Enforcement Administration. The drugs and money were delivered to an undercover police officer who would deliver these items to the particular guard who would in turn deliver the items to the juvenile inside the jail.[2] When the transaction was completed the drugs and money were returned to Sergeant Booth. "The targets of the operation were to be chosen by inmate Varner and instructed by him when and where to meet the outside contact in order to obtain the cocaine."

The trial judge found that, as a matter of law, defendants were entrapped and accordingly dismissed the charges against defendants stating:

---

[1] MCL 333.7401(2)(a)(iv); MSA 14.15(7401)(2)(a)(iv).

[2] This type of operation has been referred to as a "take-back sales" operation or a "reverse sting" operation.

The entire operation which reposed in this kind of individual the unfettered power to select grist for the judicial mill, thereby subjecting individuals to twenty year prison terms, is the kind of reprehensible police conduct contemplated by our Supreme Court in *People v Turner* [390 Mich 7; 210 NW2d 336 (1973)].

The Court of Appeals, citing its own precedent, stated that there is no prohibition per se against the use of such operations. Nonetheless, it affirmed the trial court's holding, concluding that it was not clearly erroneous. In support, the panel pointed to the trial court's finding that it was particularly reprehensible for the police to allow "a teenage convicted felon the unfettered power to orchestrate the entire operation" and to the trial court's finding that "the police not only supplied the drugs which gave rise to the crime, but also, through [Varner, the inmate], directed the entire operation." 168 Mich App 332, 338-339; 423 NW2d 655 (1988).

II

In order to reëxamine the viability of the objective test for determining entrapment, we will first examine the development of the doctrine of entrapment and its evolution into two principal tests.

A

Although the doctrine of entrapment has a popular following, even extending, in the minds of speeders, to the motorcycle policeman hiding behind a billboard, the precise parameters of this defense and the standards for its application have

not emerged without some struggle[3]—a struggle that has manifested itself in the differences between the so-called objective and subjective tests.

Entrapment has been defined as the "conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for trickery, persuasion, or fraud of the officer." *Sorrells v United States,* 287 US 435, 454; 53 S Ct 210; 77 L Ed 413 (1932). To determine whether entrapment has been established, a distinction is made between a trap for the "unwary innocent" and a trap for the "unwary criminal." *Sherman v United States,* 356 US 369, 372; 78 S Ct 819; 2 L Ed 2d 848 (1958). There is no entrapment if a policeman merely furnishes an opportunity for the commission of a crime by one ready and willing to commit the activity. The mere fact of deceit will not defeat prosecution. *United States v Head,* 353 F2d 566 (CA 6, 1965). The purpose of the defense of entrapment is to at least prevent unlawful government activity in instigating criminal activity. "The function of law enforcement is the prevention of crime and the apprehension of criminals. . . . [T]hat function does not include the manufacturing of crime." *Sherman v United States, supra* at 372.

The United States Supreme Court's rationale for an entrapment defense is grounded in an implied exception to criminal statutes.[4] It is based on the

---

[3]  [T]he meaning, purpose, and application of the defense of entrapment in criminal cases are problems that have sharply divided the Court. . . . To a large extent, that division has centered on whether the controlling standard focuses on the conduct of the government (the objective test) or the predisposition of the defendant (the subjective test). [*United States v Jannotti,* 673 F2d 578, 596 (CA 3, 1982), cert den 457 US 1106 (1982), citing *Lopez v United States,* 373 US 427, 434; 83 S Ct 1381; 10 L Ed 2d 462 (1963); *United States v Russell,* 411 US 423, 439-440; 93 S Ct 1637; 36 L Ed 2d 366 (1973).]

[4] The test for entrapment followed by the federal courts, as well as

assumption that Congress could not have intended that its statutes be enforced for criminal punishment of a defendant who has committed all the elements of a prescribed offense, but was tempted into violation of that statute by the government.

The United States Supreme Court first recognized and applied the defense of entrapment in *Sorrells v United States, supra.* In *Sorrells,* the Court held that the defendant, who had sold a half-gallon of whiskey to a United States government probation officer, was entitled to a defense of entrapment because of the "repeated and persistent solicitation" by the agent. The Court noted that "[a]rtifice and stratagem may be employed to catch those engaged in criminal enterprises," but that government may not "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Id.* at 441-442. The controlling question is "whether the defendant is a person *otherwise innocent* whom the Government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials." *Id.* at 451 (emphasis added).

*Sherman v United States, supra,* involved the selling of narcotics to a government informer who was being treated for narcotics addiction. The informant gained the trust of Sherman by sharing mutual experiences and problems in their attempt to overcome the apparent drug addiction. Because the informant was not responding to treatment, he asked Sherman to supply him with narcotics. Sherman tried to avoid the issue, but after repeated requests and the presumed suffering by the infor-

most state courts, is that derived from the majority opinions of four principal cases considered by the United States Supreme Court. *Sorrells v United States, Sherman v United States,* and *United States v Russell, supra; Hampton v United States,* 425 US 484; 96 S Ct 1646; 48 L Ed 2d 113 (1976).

mant Sherman agreed to supply him with narcotics. The United States Supreme Court concluded that entrapment was established as a matter of law.

> The case at bar illustrates an evil which the defense of entrapment is designed to overcome. The government informer entices someone attempting to avoid narcotics not only into carrying out an illegal sale but also into returning to the habit of use. . . . Thus the Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted. [*Id.* at 376.]

Again, the United States Supreme Court focused on the state of mind of the offender. " 'A different question is presented when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.' " *Id.* at 372 (citations omitted).

In *United States v Russell,* 459 F2d 671, 673 (CA 9, 1972), the United States Ninth Circuit reversed the defendant's conviction because the actions of the law enforcement officers constituted an "intolerable degree of government participation in the criminal enterprise." The United States Supreme Court reversed the circuit court decision, upheld the principles enunciated in *Sorrells* and *Sherman,* and reaffirmed that the crucial element in the defense of entrapment was the defendant's predisposition to commit the crime. *United States v Russell,* 411 US 423; 93 S Ct 1637; 36 L Ed 2d 366 (1973). The *Russell* Court stated that in "drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and limited

participation in their unlawful present practices. Such infiltration is a recognized and a permissible means of investigation . . . ." *Id.* at 432. The Court refused to extend the doctrine of entrapment beyond the majority opinions of *Sorrells* and *Sherman* holding that "the principal element in the defense of entrapment [is] the defendant's predisposition to commit the crime." *Id.* at 433. In *Russell,* the undercover agent supplied the defendant with an essential ingredient in the manufacture of "speed." The Court concluded that the defendant was predisposed because he was involved in the enterprise prior to the agent's involvement. "[I]n the words of *Sherman, supra,* [he] was not an 'unwary innocent' but an 'unwary criminal.' " *Id.* at 436.

The decisions of *Sorrells, Sherman,* and *Russell* were reaffirmed in *Hampton v United States,* 425 US 484; 96 S Ct 1646; 48 L Ed 2d 113 (1976). In *Hampton,* the defendant was convicted of the sale of narcotics and two counts of distributing heroin. The Court held that the defendant was predisposed to commit the crime. The lower court had instructed the jury that in order to convict the defendant you must "find that the Government proved 'that the defendant knowingly did an act which the law forbids, purposely intending to violate the law.' " *Id.* at 487.

> The remedy of the criminal defendant with respect to the acts of Government . . . lies solely in the defense of entrapment. [*Id.* at 490.] [E]ntrapment . . . "focus[es] on the intent or predisposition of the defendant to commit the crime," . . . rather than upon the conduct of the Government's agents. We ruled out the possibility that the defense of entrapment could ever be based upon governmental misconduct . . . where the predisposition of the defendant to commit the

crime was established. . . . "It is only when the Government's deception *actually* implants the criminal design in the mind of the defendant that the defense of entrapment comes into play" . . . . [*Id.* at 488-489. Emphasis added.]

In each of these four cases, the dissenters advocated an objective approach which shifts its focus from the defendant's state of mind to the conduct of the law enforcement officers. The rationale behind this test is that since the purpose of an entrapment defense is to prohibit reprehensible governmental methods and practices in the obtaining of a conviction, it should do so directly rather than indirectly. A defense under the objective approach is grounded on " 'whether the police conduct revealed in a particular case falls below the standards, to which the common feelings respond, for the proper use of governmental power.' " *Russell, supra* at 441, quoting *Sherman v United States* at 382.

The defense of entrapment and the public policy supporting the rule has long been recognized in Michigan jurisprudence. See *Saunders v People,* 38 Mich 218 (1878), *People v McIntyre,* 218 Mich 540; 188 NW 407 (1922), and *People v Sinclair,* 387 Mich 91; 194 NW2d 878 (1972). However, in *People v Turner, supra,* this Court renounced the subjective test followed by the United States Supreme Court and a majority of states, reasoning that the objective test is preferable because:

"[B]y definition, the entrapment defense cannot arise unless the defendant actually committed the proscribed act, that defendant is manifestly covered by the terms of the criminal statute involved.

"Furthermore, to say that such a defendant is 'otherwise innocent' or not 'predisposed' to commit the crime is misleading, at best. The very fact that

he has committed an act that Congress has determined to be illegal demonstrates conclusively that he is not innocent of the offense. . . .

"The purpose of the entrapment defense, then, cannot be to protect persons who are 'otherwise innocent.' Rather, it must be to prohibit unlawful governmental activity in instigating crime." [*Id.* at 20, quoting *Russell, supra* at 442.]

The *Turner* Court held that the defendant was entrapped as a matter of law. It stated that the agent engaged in overreaching conduct by pursuing the defendant after the first investigation did not turn up any evidence. Turner was not a drug dealer, and the agent played upon Turner's sympathy as a friend. The law enforcement officer went beyond merely creating an opportunity for the commission of a crime.

A California case, *People v Barraza,* 23 Cal 3d 675; 153 Cal Rptr 459; 591 P2d 947 (1979), also provides a rationale for adopting the objective approach instead of the subjective test. The *Barraza* court stated:

"[A] test that looks to the character and predisposition of the defendant rather than the conduct of the police loses sight of the underlying reason for the defense of entrapment. No matter what the defendant's past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society. . . . Human nature is weak enough . . . and sufficiently beset by temptations without government adding to them and generating crime." [*Id.* at 687, quoting *Sherman, supra* at 382-384.]

Further the *Barraza* court gives examples of impermissible police conduct which would consti-

tute entrapment under the objective test. The court listed as examples the following: (1) an appeal by police because of friendship or sympathy rather than for personal gain; (2) inducement that would make the commission of crime unusually attractive to a normal "law-abiding person," *id.* at 689; (3) a guarantee that the act was not illegal; (4) an offer of exorbitant consideration or similar enticement.

> [W]hile the inquiry must focus primarily on the conduct of the law enforcement agent, that conduct is not to be viewed in a vacuum . . . . We reiterate, however, that under this test such matters as the character of the suspect, his predisposition to commit the offense, and his subjective intent are irrelevant. [*Id.* at 690-691.]

As a matter of practicality, in many instances the application of the two theories overlap. When applying the subjective test, to determine if the accused is predisposed, the court must consider the official's conduct. Predisposition is linked to the amount of inducement and pressure offered by an agent as well as how long the agent persisted before commission of the illegal act. Similarly, courts applying the objective approach use the state of mind of the accused as a factor. When applying the objective test, consideration is given to the willingness of the accused to commit the act weighed against how a normally law-abiding person would react in similar circumstances. Under either approach, courts adhere to the fact that the function of law enforcement is to deter crime and not to manufacture it. This tendency of both approaches is stated in the concurring and minority opinions of the principal cases which expressly apply the subjective approach. In *Accardi v United States,* 257 F2d 168 (CA 5, 1958), the court recog-

nized that the majority opinions in *Sorrells* and *Sherman* attach almost as much importance as the minorities to the conduct of government agents and thereby include objective standards in their consideration of the defense of entrapment. The *Accardi* court held:

> The majority opinion in *Sherman* reaffirms the emphasis on the defendant's intention or readiness to commit the crime, as basic in rebutting entrapment; but the Court by no means downgrades the duty of scrutinizing closely the conduct of the government agents. In addition therefore to considering the predisposition . . . of the accused, as clearly required under the *Sorrells* and *Sherman* cases, we have weighed carefully the conduct of the government agents. [*Id.* at 172-173.]

In *Russell,* the United States Supreme Court noted that it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . ."[5] *Id.* at 431-432. Similarly, the United States Courts of Appeals for the Second and Ninth Circuits have looked to the applicability of both tests.[6] *United States v Archer,* 486 F2d 670 (CA 2, 1973); *Greene v United States,* 454 F2d 783 (CA 9, 1971). In *Archer,* the court held that "[e]ven though that view [the objective test] has not been incorporated in the entrapment defense, there is certainly a limit to allowing governmental involvement in

---

[5] Judge Adams dissenting in *United States v Twigg,* 588 F2d 373 (CA 3, 1978), suggests that federal courts have applied this due process defense in an attempt to reëstablish the objective theory of entrapment under a different name.

[6] Florida and New Mexico have combined the objective and subjective tests. See *Cruz v State,* 465 So 2d 516 (Fla, 1976); *Baca v State,* 742 P2d 1043 (NM, 1987).

crime." *Id.* at 676. In *Greene,* the court evaluated the government's involvement in terms of an amount of control the agent had, and the length of time the government was involved in the creation and maintenance of the criminal operation.

> [A] certain amount of stealth and strategy "are necessary weapons in the arsenal of the police officer." But . . . when the Government permits itself to become enmeshed in criminal activity, from beginning to end, to the extent which appears here . . . [u]nder these circumstances, the Government's conduct rises to a level of "creative activity" . . . substantially more intense and aggressive than the level of such activity charged against the Government in numerous entrapment cases we have examined. [*Id.* at 787.]

The dissent broadens the definition of entrapment stating that "it is unnecessary in this case to restrict our definition of entrapment to situations in which the police risk overcoming the will of otherwise law-abiding citizens." (*Post,* p 105, ARCHER, J., dissenting.) By looking to what constitutes "reprehensible conduct" as to each particular individual or investigation, the dissent has obviously designed a defense that will encompass all police conduct that can or will in the future, on the basis of the shock level of an individual jurist, be considered "reprehensible." This approach fails to focus on the purpose of the objective test, which is to prohibit police conduct that is, in an objective sense (not in individual cases), likely to encourage the commission of crime that would not otherwise have been committed.

The dissent further confuses the precise definition of the entrapment defense.

> In today's climate, the . . . war on drugs cre-

ates many incentives for police to sacrifice individual liberty in an effort to catch criminals . . . . [*Post,* p 103, ARCHER, J., dissenting.]

The dissent does not favor us with a description of what individual liberties have been sacrificed. It does not suggest that defendants who have been entrapped did not wilfully commit the elements of the crime, nor is there any suggestion in this case or in entrapment cases generally that constitutional or statutory rights of defendants or anyone else were violated. The dissent sets forth the inarguably correct and sage advice of Justice Thurgood Marshall that while " 'the need for action against the drug scourge is manifest, the need for vigilance against unconstitutional excess is great.' " (*Post,* p 104, ARCHER, J., dissenting.) While then disavowing that there is any unconstitutional excess in the case before us, the dissent analogizes to an exercise in vigilance "against excess in our criminal justice system." (*Post,* p 104, ARCHER, J., dissenting.) We respectfully suggest that our vigilance should also be against judicial excess which sees in the entrapment defense an opportunity to engage in far-reaching supervision of police investigative techniques and procedures unrelated to the driving force of the objective entrapment test which is whether such police conduct has as its probable and likely outcome the instigation rather than the detection of criminal activity. The dissent's view of the objective entrapment test has disregarded the fact that police work does not constitute entrapment merely because it is labeled reprehensible or utterly indefensible; rather, it is reprehensible and utterly indefensible when, in the words of Justice Potter Stewart, "the governmental agents have acted in such a way as is likely to instigate or create a criminal

offense." *Russell, supra* at 441. See *post,* pp 116-
117 (ARCHER, J., dissenting).

B

Because the entrapment test by its nature does
not invoke a determination of the guilt or inno-
cence of the defendant, but rather the means by
which the defendant's involvement was secured
and its effect on the will of the offender, its precise
theoretical underpinnings have been difficult to
discern. Both tests have as their purpose the eradi-
cation of convictions that result more from law
enforcement invention than from law enforcement
detection. The extremes range from a need for the
courts to supervise the activities of another branch
of government to the need only to determine
whether the offender was influenced by unsavory
law enforcement techniques. The objective test
looks for and condemns those police methods that
are more likely to result in the motivation of
criminal activity without regard to whether the
offender at hand was predisposed to criminal activ-
ity, whereas the subjective test focuses on the
offender to determine whether there was actual
predisposition, regardless of the law enforcement
measures employed.

In our view, each test has its flaws. The objective
test has two. First, it encourages the courts to play
a supervisory role over another branch of govern-
ment, not to determine whether there has been
illegal or unconstitutional practices engaged in by
law enforcement, but, as will be seen in the case
before us, whether the law enforcement technique
was "reprehensible." This often requires the courts
to second-guess investigative techniques and law
enforcement alternatives for which they obviously

do not have expertise.[7] Secondly, it sacrifices the conviction of an offender who is very much disposed toward the crime committed, but was fortunate enough to be snared by judicially disfavored law enforcement measures.

By the same token, the subjective test, in focusing on the predisposition of the defendant, suffers, theoretically at least, in going beyond the statutory requirement of guilt to find mitigating circumstances (not otherwise guilty) that logically speaking should not interfere with a finding of guilt. The subjective test also has the flaw of all subjective tests: attempting to determine the workings of the human mind in an individual situation.

We are encouraged by the aforementioned indications that there is some overlapping in application between the two tests and that the best of each can, to some extent, be utilized.

It is not necessary for us to announce today what we would do if we were operating on a clean slate, because we are not. Under the doctrine of stare decisis, principles of law deliberately examined and decided by a court of competent jurisdiction become precedent which should not be lightly departed.[8] Certainly the rule of stare decisis was not established

---

[7] We have seen similar efforts in our jurisprudence to use the power of the courts in the cases before it to alter conduct that is in itself not at issue before the Court. For instance, in the application of the exclusionary rule, we exclude evidence not because it is otherwise inadmissible, but in order to discourage unconstitutional conduct by law enforcement officers, an evil that is not directly before the Court. However, unlike the objective entrapment standard which has as its purpose the evaluation and discouragement of police procedures and conduct that are not necessarily invalid or unconstitutional, the exclusionary rule depends not on an inexperienced and ad hoc evaluation of law enforcement procedure, but rather on a finding of a specific violation of a well-defined constitutional protection, a uniquely judicial function. It is the responsibility of the court to determine the guilt or innocence of the offender. It is not the responsibility of the judiciary to supervise law enforcement procedure.

[8]    Alterations are not usually made in a doctrine which is

to perpetuate error or to prevent the consideration of rules of law to be applied to the ever-changing business, economic, and political life of a community. Only in the rare case when it is clearly apparent that an error has been made, or changing conditions result in injustice by the application of an outmoded rule, should we deviate from following the established rule. [*Parker v Port Huron Hosp,* 361 Mich 1, 10; 105 NW2d 1 (1960).]

We do not, however, find this Court's commitment to the objective test to be so undermined by time or circumstances that it should be discarded. We have been persuaded by the arguments on rehearing and by our own review of the law that stare decisis should carry the day.

### III

We now turn to the application of the objective test to these cases.

When an accused claims entrapment, the trial court must conduct a separate evidentiary hearing to resolve the issue. The defendant bears the burden of proving by a preponderance of the evidence that law enforcement officials engaged in reprehensible behavior to obtain a conviction. The facts of each case must be examined to determine whether, under the circumstances, the governmental activity would induce a hypothetical person not ready and willing to commit the crime to engage in criminal activity. The trial judge's findings on the issue are subject to appellate review under the clearly erroneous standard. *People v D'Angelo,* 401 Mich 167, 183; 257 NW2d 655 (1977).

In these cases the trial court found, as a matter

serving well, and with which the bench, bar and public are satisfied. [*Kirby v Larson,* 400 Mich 585, 618; 256 NW2d 400 (1977).]

of law, that the police conduct was outrageous and reprehensible because:

> (1) the state supplied the narcotics which became the subject of the prosecution;
> (2) the state considered no alternative plans;
> (3) the state, in fact, designed the very plan in question, there being no evidence that the scheme was suggested by any individual suspect guard;
> (4) the state determined no specific targets by name prior to execution of the plan;
> (5) the state made no determination that any particular guard was involved in any ongoing illicit activity; and finally
> (6) the state violated its public trust and abrogated its responsibility to properly supervise a criminal investigation by permitting the operation to be produced, directed and choreographed by a teenaged felon.
>
> The entire operation which reposed in this kind of individual the unfettered power to select grist for the judicial mill, thereby subjecting individuals to twenty year prison terms, is the kind of reprehensible police conduct contemplated by our Supreme Court in *People v Turner.*

The particular law enforcement strategy to be used in any given circumstance to detect crime should be left to the discretion of law enforcement officials. It is almost an impossible, if not inappropriate, task to define the appropriate professional standards over which a separate branch of government should operate. It is, however, the primary responsibility of courts to protect the integrity of the judicial system when, in furtherance of a conviction, conduct which rises to an outrageous and reprehensible level, as defined by the entrapment defense, is used.

We conclude that in these cases the lower court's findings merely serve to suggest that the

police investigation may have been inadequate. Indeed, the procedures employed by the government in these cases may not have been the only or most desirable methods by which to control drug trafficking in the prison; however, this is an insufficient basis upon which to support a finding of entrapment. We agree with the Court of Appeals in *People v Crawford,* 143 Mich App 348, 354; 372 NW2d 550 (1985), when it said: "[T]he defense of entrapment was not intended to be the remedy for any and all misconduct or neglect by police and their agents. The defense is only a remedy for conduct likely, when objectively considered, to induce or instigate the commission of the crime by a person not ready and willing to commit it."

It is not for us to judge if the scheme or plan employed was the best or most effective way to detect criminal behavior. Thus, the fact that no alternative plans were considered prior to the implementation of the sales operation in this case is irrelevant when evaluating a defense of entrapment. The focus in cases involving entrapment has been on whether the specific police conduct under review was reprehensible, as defined by the entrapment defense, and not whether the police would have been wise to employ other tactics. The question of entrapment centers on whether the police conduct served to manufacture rather than investigate the crime in question—not whether alternative means might have produced a perfect investigation.

In practice, government undercover activity may be the only way to detect some criminal acts carried on in secret. An official may employ deceptive methods to obtain evidence of a crime as long as the activity does not result in the manufacturing of criminal behavior. In fact, "in drug-related

offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation . . . ." *Russell, supra* at 432. See also *People v Henley,* 54 Mich App 463; 221 NW2d 218 (1974). Furthermore, as the Court of Appeals in these cases stated, the use of such undercover sales operations as a means by which to detect criminal activity is not indicative of entrapment per se. See, e.g., *People v Roy,* 80 Mich App 714; 265 NW2d 20 (1978), lv den 402 Mich 903 (1978), and *People v Duke,* 87 Mich App 618; 274 NW2d 856 (1978).

In these cases, the Wayne County Sheriff's Department was approached by an inmate who informed it of criminal activity at the jail involving prison guards. The evidence disclosed that the informant had witnessed ongoing criminal activity, observed contraband coming into the jail, and had been approached by some of the guards about delivery of drugs to him inside the jail. It was the informant who approached the sheriff's department, hoping for a reduction in his sentence—not the police who sought out informants for the purpose of developing criminal activity. The government did not, as the dissent suggests, "invent[ ] the crime." (*Post,* p 108, ARCHER, J., dissenting.) Rather, the sheriff's department merely decided to act upon information received from an inmate.[9]

The defendants and the dissent assert that it was error to use an "adolescent" informant who

---

[9] Our Court of Appeals in *People v Smalls,* 139 Mich App 759, 765-766; 362 NW2d 805 (1984), ruled that a valid undercover operation was instituted by police upon receiving tips from "nonpublic sources after observing suspicious activities" suggesting the existence of ongoing prostitution.

lacked maturity in the undercover operation.[10] We do not see the error in allowing a sixteen-year-old who was convicted *as an adult* and incarcerated in an *adult prison* to participate as an informer in the investigation. Drug trafficking investigation as a general rule requires the use of informers with contacts in the drug culture. *People v Henley, supra.* "These informers are commonly drug offenders who have been promised leniency in return for cooperation."[11] Because of their status, generally they are always going to be of questionable character and stability.

The transaction involved very limited contact and was a one-time occurrence resulting in the arrest of defendants. The informer was not called upon to repeatedly solicit the targets in order to complete the transaction.[12] The facts do not suggest that the government used friendship or sympathy to lure defendants into criminal activity. The inmate, although allowed to select the individuals to be targeted,[13] was anything but in control

[10] Use of a minor as an instrumentality in an undercover investigation was not improper. See, e.g., *People v Reynolds,* 139 Mich App 471; 362 NW2d 763 (1984).

[11] Park, *The entrapment controversy,* 60 Minn L R 163, 231 (1976).

[12] Even repeated contacts are not necessarily sufficient to support a finding of entrapment as a matter of law. See *People v Edwards,* 107 Mich App 767; 309 NW2d 607 (1981) (five to seven contacts); *Oakland Co Prosecutor v Forty-Sixth Dist Judge,* 72 Mich App 564; 250 NW2d 127 (1976) (twenty-five or twenty-six telephone contacts).

[13] The dissent discusses the unreasonableness of using an inmate in the operation under a selective enforcement type of rationale:

> It was particularly unreasonable to allow an inmate to select the targets of an undercover operation inside a penal institution. The society inside a jail or a prison is highly fractured; individuals within such institutions, particularly individuals engaged in illicit activities, often develop intense loyalties for those whom they consider friends, and strong distrust and dislike for those perceived as enemies. When the police officers allowed Quinton Varner to select the targets of the operation, they must have recognized the probability that Quinton Varner *would be selective in his work.* Rather than constructing an

of the activity. The formulation of the plan occurred outside the county jail and outside the control and influence of the informant.

In fact it was the police who secured the drugs, money, and outside contacts. The informant's only discretion and role was to inquire of his guards whether they would serve as couriers for his purported drug need. The defendants are all prison guards with control over inmates, not vice versa. If correctional officials play the role we all expect of them, then defendants were under no pressure to please inmates under their charge. On the record before us, the case simply cannot be made that this sixteen-year-old inmate preyed upon the weaknesses of his captors to the extent that they would be induced beyond a readiness to make contact

operation that would capture those guards *already engaged* in illicit drug trade and, it would be hoped, those at the center of that trade, the police officers created a situation in which Quinton Varner was allowed to subvert any individual he wished, without regard to that individual's previous involvement in the drug trade. Meanwhile, Quinton Varner was free *to leave untouched those individuals whom he chose not to see arrested,* regardless of whether those individuals were *amongst those most responsible for the presence of drugs in the Wayne County Jail.* [*Post,* pp 120-121, ARCHER, J., dissenting. Emphasis added.]

Beyond the fact that much of the above analysis examines the subjective predisposition of possible targets, selective enforcement is a criticism that is common to our entire system of criminal jurisprudence. As one commentator writes:

It will not do to claim that entrapment is necessary to prevent the executive from engaging in selective application of the criminal sanction, because within broad limits, we tolerate precisely this risk when the universe of potential criminals consists solely of persons acting without government inducement. When the government chooses which shoplifters, pickpockets, and drug users to prosecute and to jail, we regularly rely upon political checks to guard against abuse. Why do these checks become suddenly inadequate when the class of potential criminals is broader? [Seidman, *The Supreme Court, entrapment, and our criminal justice dilemma,* 1981 Sup Ct R 111, 146.]

with an alleged drug supplier outside the jail and to transport drugs inside the jail to such an inmate. Opportunity, yes, seduction, no.

Some emphasis was placed on the fact that the juvenile informer was left unprotected and unsupervised. We know of no rule of law or prison administration which would *require* that the government provide protection or supervision for those who volunteer to act as informants for the government.

Defendant tries to distinguish this case from *People v Roy, supra,* on the ground that the sheriff herein used actual cocaine rather than a facsimile in the operation. Without the use of actual cocaine there would have been a missing element of the crime.[14] The mere fact that the government furnished a necessary element to the criminal transaction does not require a finding of entrapment.

The dissent presents a very thorough evaluation of cases from other jurisdictions that have found similar drug transactions where the government furnishes an element of the offense as amounting to police overinvolvement in criminal activity. We note first that the authority relied on by the dissent is not binding on this Court and that evaluation of this type of drug sales operation is an issue of first impression for this Court. Further, the federal cases relied upon by the dissent extend its analysis beyond the entrapment defense to either unlawful or unconstitutional action. Neither unlawful nor unconstitutional governmental action requires the entrapment defense for its eradi-

---

[14] The dissent refers to the risk of "[a]llowing actual narcotics to travel into the jail and remain . . . in the possession of a sixteen-year-old inmate . . . ." (*Post,* p 119.) The dissent does not tell us what the risk was and to whom it was a risk. Since the law enforcement agents were supplying the drugs, they knew precisely who was bringing them in and to whom they were going to be delivered and would know whether or not any of the drugs had been used.

cation. The federal judiciary is committed to apply-
ing the subjective test to the entrapment defense,
and although it is familiar with the objective test
in theory, it has not had an opportunity to test or
develop precedent regarding what constitutes re-
prehensible police conduct as defined by the objec-
tive entrapment defense. Therefore, we do not
share in the dissent's heavy reliance on the federal
judiciary's interpretation of the objective entrap-
ment test.

Michigan has described itself as being "at the
forefront in protecting persons from being con-
victed of a crime which was instigated, induced or
manufactured by a government agent." *People v
White,* 411 Mich 366, 387; 308 NW2d 128 (1981).
Since *Turner,* when the objective test was adopted,
this Court has only ruled on its application in four
cases. However, our Court of Appeals has had
many occasions to rule on the issue, and, accord-
ingly, a body of common law has developed in this
state to define the standards and boundaries of the
defense.

The cases relied upon by the dissent do not
compare factually with the uniqueness of the facts
of these cases. Although in each case cited by the
dissent the government either acted on both sides
of the criminal transaction or supplied contraband,
the defendants did not have the same status as the
prison guards in these cases. For example, we
question whether the outcome in *United States v
Bueno,* 447 F2d 903 (CA 5, 1971), would have been
the same if the defendant had been a customs
official. The average individual would have a diffi-
cult, if not impossible task, unlike a guard, of
transporting narcotics into a correctional facility.
We find that reliance upon the common law of
other jurisdictions, while persuasive, is unneces-
sary to reach a determination in this case.

The cases that most resemble the unique facts of the cases before us are from our own Court of Appeals. In *People v Duke, supra,* the state supplied heroin to defendant, a prison guard, to deliver to an inmate. Although the police intended to arrest Duke after the drugs were smuggled into the prison, because he did not go directly to the prison, he was arrested and charged with possession. The *Duke* panel refused to apply a rule set forth by the Court of Appeals two years earlier in *People v Stanley,* 68 Mich App 559; 243 NW2d 684 (1976). In *Stanley,* although the panel remanded the case for a hearing on the entrapment defense, the Court set forth a rule barring conviction per se from the sale of contraband obtained from the government. We agree, as does the dissent, with those panels of the Court of Appeals that have refused to apply the per se rule of *Stanley.* See *People v Duke, supra; People v Roy, supra; People v Forrest,* 159 Mich App 329; 406 NW2d 290 (1987). We hold that the fact that the government supplied the contraband is only one factor relevant to the entrapment analysis.

An evaluation of police investigative techniques and procedures cannot be made without reference to the particular nature of the various categories of criminal infractions. The government's role in providing actual contraband is an example of an investigative technique that responds to the nature of this particular type of criminal violation.

It is questionable whether the judicial rhetoric over the years about "reprehensible law enforcement" could have flowed so easily in early opinions had the drug phenomenon existed a century ago. For instance, in *Saunders v People, supra,* our most distinguished predecessor bench described as "scandalous and reprehensible" certain law enforcement conduct that today would be considered

by any fair-minded person to be effective law enforcement activity. In that case, an attorney offered to bribe Policeman Webb "to leave the door of [the police courtroom] unlocked" in order that he might get in to steal material from court files. Rather than discouraging the offer and the subsequent entry, the officer after consulting with his "superior officer" agreed to the offer and then participated in observing the eventual completion of the intended crime. That factual setting generated the first acknowledgment by this Court of an entrapment defense. Even though that precise type of conduct would not today substantiate an entrapment defense, and in fact is most likely a standard investigative operating procedure, the rhetoric supporting the *Saunders* decision continues to be employed to condemn some law enforcement practices that on their face are nothing short of good law enforcement techniques.

A review of the common law of this state shows that discretionary investigative enforcement measures extend beyond a tolerable level when *by design* the government uses continued pressure,[15] appeals to friendship or sympathy,[16] threats of arrest,[17] an informant's vulnerability,[18] sexual favors,[19] or procedures which escalate criminal culpability.[20] All of these traditional inducements are absent from the facts of this case.

We conclude that the furnishing of contraband

[15] *People v White, supra; People v Larchinese,* 108 Mich App 511; 310 NW2d 49 (1981); *People v Asher,* 67 Mich App 174; 240 NW2d 749 (1976).

[16] *People v Turner, supra; People v Alford,* 405 Mich 570; 275 NW2d 484 (1979); *People v Letts,* 122 Mich App 135; 332 NW2d 438 (1982).

[17] *People v Gratzer,* 104 Mich App 704; 305 NW2d 300 (1981).

[18] *People v Duis,* 81 Mich App 698; 265 NW2d 794 (1978); *People v Soper,* 57 Mich App 677; 226 NW2d 691 (1975).

[19] *People v Wisneski,* 96 Mich App 299; 292 NW2d 196 (1980).

[20] *People v Killian,* 117 Mich App 220; 323 NW2d 660 (1982).

by the government is insufficient to induce or instigate the commission of a crime by the average person, similarly situated to these defendants, who is not ready and willing to commit it. We also note that this is not a case where the government's furnishing of narcotics was for the purpose of trying to escalate the criminal culpability of defendants. *People v Killian,* 117 Mich App 220; 323 NW2d 660 (1982).

Finally, the trial judge expressed concern over the fact that there was insufficient police control over the entire operation.[21] He specifically stated that the "state violated its public trust and abrogated its responsibility to properly supervise a criminal investigation by permitting the operation to be produced, directed and choreographed by a teenaged felon." However this factor only suggests that the criminal enterprise was not manufactured by the government officials.

By way of example we distinguish this case from *People v Duis,* 81 Mich App 698; 265 NW2d 794 (1978), where the Court of Appeals found entrapment as a matter of law. Although the panel stated that the informant was not adequately supervised and was allowed to select the victim, a proper reading of the opinion suggests that the overreaching by the police was the result of the employment of the informant. The police contacted the informant because he was in a vulnerable position and they knew he could contact drug dealers. Further, the police had not focused on any specific drug dealers under investigation.[22] The

---

[21] We note that the conclusions of the lower courts in this case are contradictory. On the one hand, the courts based their findings of entrapment on the fact that it was outrageous for the government to give a teenage felon the "unfettered power" to direct the operation. Yet the courts also concluded that the police directed the entire operation.

[22] This is not to suggest that the state must have reasonable

facts of the instant case show that prison guards were the target group of the police investigation. Additionally, once the defendant in *Duis* was selected as the victim, the informant used pressure, a play on defendant's sympathy, and exploitation of a friendship to culminate the criminal act. These additional factors are clearly absent in this case.

While this case presents heavy governmental involvement in supplying the drugs, the money, and the informant, it only differs in degree from the normal supply of either money or drugs in a more routine drug transaction.[23] Further, it was not a fishing expedition, unrelated to specific targets. In fact, the specific targets and the scheme to present them an opportunity were confined to the

---

suspicion or probable cause before an undercover investigation is undertaken. As another panel of the Court of Appeals has stated:

> Requirements of focus, probable cause, or reasonable suspicion cannot logically be derived from the objective test of entrapment, because such requirements have nothing to do with whether the police conduct was of a kind that could induce or instigate the commission of the crime by a person not ready and willing to commit it. [*People v Reynolds,* 139 Mich App 471, 478; 362 NW2d 763 (1984).]

[23] The dissent asserts that the police used " 'intolerable conduct,' " "created criminals," "created new avenues for the transportation of the substance," "sent actual narcotics into the jail [rather than] a facsimile," that it is unreasonable to vest in an informant the "unfettered power to choose the targets," "[n]or should he [the informant] have been trusted to approach his targets in a manner mindful of the rights of those individuals," and the gratuitous comment that "[i]nstead of taking the time and effort to discover the preëxisting channels by which cocaine entered the jail, the police allowed a sixteen-year-old felon to create new channels . . . ." (*Post,* p 118, ARCHER, J., dissenting.)

Short of these conclusory statements, the dissent has not made a single palatable argument that the conduct that was engaged in to uncover the crimes of which the defendants have been convicted amounted to conduct that, according to authority cited by the dissent would create a "risk that otherwise reasonable, law-abiding citizens will be enticed into violating the law." (*Post,* p 104, ARCHER, J., dissenting.)

most controlled setting imaginable, namely, a correctional facility.

The dissent suggests that had the officers in this case had reasonable suspicion regarding any of the particular targets, the scheme employed may have been less reprehensible. What the dissent is actually implying is that society is less likely to be offended by police conduct that entraps the predisposed individual. Such a position is exactly what the opponents of the objective test criticize it for and in fact argues in favor of the subjective test.[24] As Justice Frankfurter wrote in *Sherman, supra* at 383:

Permissible police activity does not vary according to the particular defendant concerned; surely if two suspects have been solicited at the same time in the same manner, one should not go to jail simply because he has been convicted before and is said to have a criminal disposition. No more does it vary according to the suspicions, reasonable or

---

[24] For example, objectivists' most fundamental objection to excessive encouragement is that it is "shocking to the moral standards of the community," and that it causes "injury to the reputation of law enforcement institutions." But if government encouragement is confined to defendants who already intend to violate the law, it is unlikely that community standards would be shocked even by inducements that might, in some other context, entice an ordinary person to crime. On the other hand, the community is likely to be very concerned if even modest inducements are used to encourage and convict ordinary law-abiding citizens who had no preëxisting intent to violate the law. Community outrage is probably more related, as the subjective approach recognizes, to the type of person caught by the government—a professional criminal or an otherwise innocent citizen—than to the exact tactics employed by the police. Furthermore, the objective approach may in fact work to undermine, rather than enhance, the reputation of the police. The release of obviously dangerous and predisposed offenders because the "constable blundered" is, after all, hardly calculated to build respect for the forces of law and order. [Carlson, *The act requirement and the foundations of the entrapment defense,* 73 Va L R 1011, 1047 (1987).]

unreasonable, of the police concerning the defendant's activities.

While the dissent criticizes our approach as too narrowly confining the defense, its application extends too broadly. The *Turner* Court clearly stated that a defendant's past criminal propensities were not to be considered under an objective evaluation. Thus, to even suggest that the police need reasonable suspicion before institution of a plan to detect and prevent crime is to take the objective test beyond its appropriate limits.

The targets were not unwary or vulnerable. To the contrary, they were trained in law enforcement, sworn to uphold the law, and spent their working days in a most controlled environment in which they were in charge. The plan to uncover the reported source of drugs in the jail did not prey on human weakness (it is hoped that transporting drugs into a jail by correction officers is not seen as a normal human weakness) or friendship or the use of authority to intimidate. Law enforcement corruption is not, and should not be, taken lightly when reported, and more often than not requires painstaking investigation to uncover. As has been noted by many courts and observers of the entrapment phenomenon, it is difficult to set forth precisely a definition of the kind of law enforcement measures that shock the sensibilities of the courts. But whatever it may be, this case does not present it.

We would hold that the trial court's finding of entrapment under the objective theory was clearly erroneous. The government conduct in this case does not violate any public policy of this state and did not amount to governmental manufacturing or inducement of criminal behavior. The police activity served only to provide an opportunity for defendants to engage in criminal activity.

RILEY, C.J., and BOYLE, J., concurred with BRICK-LEY, J.

CAVANAGH, J. (*concurring*). I concur with the lead opinion because it comports with this Court's past interpretations of the objective test of entrapment. The lead opinion states that "[the test of entrapment is] whether, under the circumstances, the governmental activity would induce a hypothetical person not ready and willing to commit the crime to engage in criminal activity." *Ante,* p 80. Similar language appears in the Model Penal Code, § 2.13, p 405, and in Justice Stewart's dissent in *United States v Russell,* 411 US 423, 445; 93 S Ct 1637; 36 L Ed 2d 366 (1973).

The term "ready and willing to commit the crime," however, does not necessarily require that a court applying this objective test look to the state of mind of the accused. The Utah Supreme Court in *State v Hansen,* 588 P2d 164, 166 (Utah, 1978), construed the same phrase from a statute based upon the Model Penal Code as "expressly recogniz[ing] both [the] concepts" of the objective test and the subjective tests. But *Hansen* misreads the language of the Model Penal Code as the Utah Supreme Court later held in *State v Taylor,* 599 P2d 496 (Utah, 1979). The defense of entrapment, as formulated under the objective approach is available even to defendants who are ready and willing to commit the crime, so long as the "conduct of the government" fails to comport with "a fair and honorable administration of justice." *Id.* at 500.

The dispositive inquiry under the objective test of entrapment in Michigan is not whether the crime was *caused* by, or was the product of, the creative activity of law enforcement officials, but whether the crime was committed at the instigation of "reprehensible" police conduct.

This Court has rejected the subjective test because it requires a court to convict a criminally predisposed defendant whose guilt is proven after he is ensnared by truly reprehensible police conduct. The objective test is designed to prevent such judicial involvement in police investigative practices that break the law or endanger the health or morals of police agents in their zeal to punish certain crimes. In *State v Taylor, supra,* for example, the Utah Supreme Court found entrapment as a matter of law under the objective test where an informant (who was a prostitute, a heroin addict, and a minor) was paid a fee to arrange drug sales between suspected heroin dealers and the police. The informant was induced to develop close personal relationships with these drug dealers, including ongoing sexual relations. The police threatened to disclose to these suspected heroin dealers that she was a police informant if she did not coöperate. Moreover, the police knew that the money they were paying her was being used to feed her own drug addiction. This method of police investigation was properly found to be "a perversion of the proper standards of administration of criminal law." *Id.* at 504.

*Taylor* illustrates the need to adopt a version of the objective test that does not define the reprehensibility of police conduct by reference to the personality traits of a hypothetical law-abiding citizen.

Turning to the question whether the actions of the police and their agents constitute entrapment in this case, I begin with the principle that affording a person an opportunity to commit an offense does not ordinarily constitute entrapment *unless* (1) the circumstances indicate that such an opportunity would not normally be presented *or* (2) the mere furnishing of the opportunity requires the

police to commit certain criminal, dangerous, or immoral· acts. I am prepared to assume that drug smuggling opportunities are presented to jail guards on a regular basis.

Thus, even if the police did not have probable cause to believe that Wayne County Jail guards were actively smuggling drugs to inmates, an undercover police officer could pose as a jail inmate and make offers to jail guards to buy drugs. Such an undercover operation would not constitute entrapment under the objective test. Our jails are filled with former drug addicts and dealers. While it is reasonable to assume that jail inmates are actively seeking to buy drugs from any available source, no similar assumption is justified with regard to citizens in the general population.[1]

In a jail setting, however, I would permit a prosecution of guards trafficking in drugs, where the government supplies contraband to a jail or prison guard to be delivered to an inmate inside a correctional facility. See, e.g., *People v Roy,* 80 Mich App 714; 265 NW2d 20 (1978), and *People v Duke,* 87 Mich App 618; 274 NW2d 856 (1978). Even where a "take-back" sale of drugs to jail guards has been found to constitute entrapment, see, e.g., *People v Stanley,* 68 Mich App 559; 243 NW2d 684 (1976), the Court below refused to adopt a rule prohibiting all government transfers of drugs per se on entrapment grounds.

This case is different than *Stanley* because the "take-back" sale occurred in the jail as an effort to target jail guards who acted as "couriers" deliver-

[1] A plan to have undercover police agents pose as drug dealers and offer to sell drugs to individuals randomly chosen on the street would raise a much more serious entrapment problem. But, any concern I have under the entrapment doctrine about a government undercover investigation designed to "test the virtue" of its citizens, absent a reasonable suspicion of ongoing criminality in the local area, is not implicated by the unique facts of this case.

ing drugs into the jail from an outside supplier designated by the inmate. Given the uniqueness of the crime and its setting, there is a special need to provide the target with contraband from a government agent in a "take-back" sale. If the buyer was on the outside of the jail, by contrast, the court could assume that the buyer would have access to nongovernmental sources of supply. In the jail setting, however, the inmate may lack the funds or be unable to communicate with a source outside the jail so that a "sting" operation could be coördinated.

Normally, the fact that a minor, acting as a police agent, was given unsupervised power to select the targets of the "sting" operation would be a factor that would weigh in favor of a finding of entrapment under our objective test. The actions of the informant in this case, however, occurred in a jail setting where the police have the ability to closely monitor the situation to guard against dangers as they develop. Given the controlled setting in which the "take-back" sales took place, I conclude that the unsupervised activity of the informant does not present dangers that make the police action at issue here "reprehensible."

Thus, on these unique facts, I concur in the result reached in the lead opinion.

LEVIN, J. (*concurring*). I concur in the adherence to the objective theory of entrapment and in the reversal. Having in mind that prisoners are not at liberty to communicate with authorities or persons in the "free world" without running the risk of detection, and that they are vulnerable to oppression by their overseers[1] and other inmates, methods that would be unacceptable in other settings

---

[1] Sed quis custodiet ipsos Custodes?

are tolerable to root out venality in a prison setting.

GRIFFIN, J. (*concurring in part and dissenting in part*). Although I concur in the result reached by the majority, I wish to register my disagreement with use of the so-called "objective" test as the basis for resolving claims of entrapment.

Unless police conduct in a given situation is so reprehensible as to violate constitutional standards imposed by the Due Process Clause,[1] I do not believe that one who is guilty of committing a criminal act should be exonerated by the judiciary simply because it disapproves of conduct on the part of another branch of government. While constitutional limitations must be strictly observed, it is my view that the defense of entrapment, which has no constitutional base whatever, should be eliminated. Short of that, we should at least move to the "subjective" standard for judging entrapment, a position already taken by courts in the federal system and in the overwhelming majority of our sister states.[2]

---

[1] See *United States v Russell*, 411 US 423; 93 S Ct 1637; 36 L Ed 2d 366 (1973).

Although a plurality in *Hampton v United States*, 425 US 484; 96 S Ct 1646; 48 L Ed 2d 113 (1976), would have made the due process defense unavailable to a predisposed defendant, a majority of the justices expressly disagreed. Subsequently, lower federal courts have recognized the viability of the due process defense. See, e.g., *United States v Bradley*, 820 F2d 3 (CA 1, 1987); *United States v Dyman*, 739 F2d 762 (CA 2, 1984), cert den 469 US 1193 (1983); *United States v Twigg*, 588 F2d 373 (CA 3, 1978); *United States v Hunt*, 749 F2d 1078 (CA 4, 1984), cert den 472 US 1018 (1985); *United States v Tobias*, 662 F2d 381 (CA 5, 1981); *United States v Brown*, 635 F2d 1207 (CA 6, 1980); *United States v Belzer*, 743 F2d 1213 (CA 7, 1984), cert den 469 US 1110 (1985); *United States v Mazzella*, 768 F2d 235 (CA 8, 1985), cert den 474 US 1006 (1985); *United States v Prairie*, 572 F2d 1316 (CA 9, 1978); *United States v Spivey*, 508 F2d 146 (CA 10, 1975), cert den 421 US 949 (1975); *United States v Kelly*, 228 US App DC 55; 707 F2d 1460 (1983), cert den 464 US 908 (1983).

[2] See anno: *Modern status of the law concerning entrapment to commit narcotics offenses—state cases*, 62 ALR3d 110.

It is my hope that when a more appropriate case is presented, this Court will reconsider its adherence to the so-called objective test for entrapment. In the meantime, while a Court majority persists in using the so-called objective test for resolution of entrapment claims, I wish to make clear that I prefer, and associate myself with, the version of that test articulated by Justice BRICKLEY.

ARCHER, J. (*dissenting*). Defendants were charged with one count of delivery of less than fifty grams of cocaine, pursuant to MCL 333.7401(2)(a)(iv); MSA 14.15(7401)(2)(a)(iv). Detroit Recorder's Court Judge Michael F. Sapala dismissed the charges, finding that the defendants had been entrapped as a matter of law. The Court of Appeals affirmed. We granted leave to appeal to consider whether the trial court erred in finding that the defendants had established a defense of entrapment.[1] We ordered reargument regarding whether we should abandon the objective theory of entrapment.[2] I concur in the Court's affirmation of our adherence to the objective theory of entrapment, but I dissent from the majority's application of that test to the facts of this case. I do not believe the trial court clearly erred in ruling that the police officer's conduct entrapped these defendants.

### FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises from a 1985 undercover operation undertaken in the Wayne County Jail. In the fall of 1985, Quinton Varner, then a sixteen-year-old inmate, informed Wayne County Jail officials that an unspecified number of deputy sheriffs assigned to guard duty at the jail were smuggling

[1] 431 Mich 906 (1988).
[2] 433 Mich 1226 (1989).

narcotics to inmates.[3] Varner, who was serving a ten-month sentence for several larceny convictions, volunteered to approach officers and request narcotics in exchange for a thirty-day reduction in his sentence. By September 1985, jail officials conducted several meetings with members of the Wayne County Prosecutor's Office, which resulted in a plan to institute an undercover "take-back" operation. A "take-back" scheme is an undercover operation in which the government supplies the contraband which one government agent transfers to an intermediary, who, in turn, delivers the contraband to a second government agent, at which time the intermediary is arrested for his role in the transaction.

The plan required Varner to approach jail guards of his own choosing with a request that they transport into the jail cocaine from a source *outside the jail whom Varner would identify.* Upon a guard's agreement to provide the narcotics, Varner typically would obtain a home phone number. He would later call the guard from the office of Wayne County Jail officials who monitored the conversation. Upon obtaining a supply of authentic cocaine from a third-party undercover officer posing as the supplier, the guards would then deliver the drugs to Varner in exchange for payment. After receiving the narcotics, Varner eventually delivered the cocaine to jail officials overseeing the undercover operation. Varner was not told

---

[3] The lead opinion misreads the record when it claims that "Varner furnished the government with 'a couple' of names . . . ." *Ante,* p 66. The record is completely inconclusive on this issue. While it seems clear that in the course of the scheme Varner gave jail officials names of guards he had convinced to smuggle for him, Sergeant Booth, the officer in charge of the undercover operation testified that on September 24, 1985, some nineteen days after his initial contact with Varner, he "didn't know any officer was involved." The record is clear, however, that Sergeant Booth first learned the names of some of these defendants after his first meeting with Varner.

to approach any particular officer. Nor was he instructed regarding the manner in which he was to request the drug deliveries.

As a result of the undercover operation, the five defendants, Wayne County sheriff's deputies, were charged with one count of possession with intent to deliver cocaine. In return, Varner received the agreed-upon thirty-day reduction in his jail term.

The defendants' cases were consolidated to determine whether the undercover operation constituted entrapment as a matter of law. As a result of a lengthy evidentiary hearing, Judge Sapala, on March 27, 1986, issued a detailed opinion concluding that the undercover operation violated the objective standard of entrapment adopted by this Court in *People v Turner*, 390 Mich 7; 210 NW2d 336 (1973). The trial court stated in relevant part:

> If the plan adopted were the only reasonable and effective means of eliminating the problem of jail guards introducing narcotics into the jail, then it should be sanctioned. There were, however, alternatives available; perhaps not as efficient but certainly as reasonable and with far less potential for abuse. The legality of a law enforcement technique simply cannot be measured by its effectiveness. Due process is the standard against which government conduct must be measured.
>
> A proper investigation would surely have lead [sic] to suspects known by name before any deliveries were to be arranged. Random selection under these circumstances must not be tolerated. Detroit and Wayne County law enforcement personnel are well schooled in the art of undercover police work; one of them could have "played" a Quinton Varner.
>
> To avoid the dubious practice of the government itself supplying narcotics, Varner could have been directed to invoke his own outside sources for supply and transfer to a known, suspect guard. This alternative was not considered.

At the hearing, Varner testified he made direct buys himself from jail guards. That alternative was not considered.

To avoid the risk of permitting narcotics into the jail and into the unsupervised hands of Varner, suspect guards could have been arrested outside of [sic] the jail upon receipt of the narcotics. In terms of jail integrity and its freedom from narcotics, charges of possession of cocaine rather than delivery of cocaine would have sufficed.

Certainly, the Sheriff's Department was confronted with a very serious and difficult problem. Any solution to that problem, however, must be lawful as well as effective.

In the cases before us:

(1) the state supplied the narcotics which became the subject of the prosecution;

(2) the state considered no alternative plans;

(3) the state, in fact, designed the very plan in question, there being no evidence that the scheme was suggested by any individual suspect guard;

(4) the state determined no specific targets by name prior to execution of the plan;

(5) the state made no determination that any particular guard was involved in any ongoing illicit activity; and finally

(6) the state violated its public trust and abrogated its responsibility to properly supervise a criminal investigation by permitting the operation to be produced, directed and choreographed by a teenaged felon.

The entire operation which reposed in this kind of individual the unfettered power to select grist for the judicial mill, thereby subjecting individuals to twenty year prison terms, is the kind of reprehensible police conduct contemplated by our Supreme Court in *People v Turner.*

The prosecutor appealed, and the Court of Appeals affirmed.[4] We granted leave to consider

---

[4] *People v Jamieson,* 168 Mich App 332, 338; 423 NW2d 655 (1988).

whether the trial court and Court of Appeals erred
in finding entrapment. 431 Mich 906 (1988). We
then ordered resubmission on the issue whether
this Court should abandon the objective entrap-
ment defense adopted in *People v Turner,* 433
Mich 1226 (1989).

,    I

I concur in the portion of the lead opinion which
reaffirms this state's adherence to the objective
theory of entrapment, though my reasons for leav-
ing the law unchanged are broader than the stare
decisis principles cited by the lead opinion. The
principles which steered us in our affirmation of
the objective test in *People v Turner* are equally, if
not more, applicable today, because its primary
purpose is the discouragement of law enforcement
overreaching and "reprehensible" police conduct.
In today's climate, the unchecked fury of a vital
war on drugs creates many incentives for police to
sacrifice individual liberty in an effort to catch
criminals, particularly drug traffickers we can call
predisposed. Now, more than ever, our courts need
a mechanism by which they can assure that law
enforcement conduct does not "fall[ ] below stan-
dards, to which common feelings respond, for the
proper use of governmental power." *Sherman v
United States,* 356 US 369, 382; 78 S Ct 819; 2 L
Ed 2d 848 (1958) (Frankfurter, J., concurring in
the result).[5]

The task of destroying illicit narcotics trade
obviously requires not only artifice and police
deception, but continuous law enforcement creativ-
ity. It is indisputable, however, that in a society

---

[5] I note also that only one legal scholar writing on the entrapment
theory in the previous twenty years has found the subjective entrap-
ment theory to be based in sound reason and good public policy. See
Park, *The entrapment controversy,* 60 Minn L R 163 (1976).

which cherishes freedom, there must be limits on how far police may go in order to capture wrongdoers. Unless the courts in this society establish those limits, there is no disincentive to police overreaching, only the powerful incentive to stem the tide of drugs at whatever cost. As Justice Thurgood Marshall said in *Skinner v Railway Labor Executives Ass'n*, 489 US 602, 635; 109 S Ct 1402; 103 L Ed 2d 639 (1989):

> The issue in this case is not whether declaring a war on illegal drugs is good public policy. . . . Precisely because the need for action against the drug scourge is manifest, the need for vigilance against unconstitutional excess is great.

While the issue in this case does not involve "unconstitutional excess," it nevertheless calls on this Court to exercise vigilance against excess in our criminal justice system. I join in affirming this Court's adherence to the objective theory of entrapment because our courts cannot countenance reprehensible police conduct.

## II

I agree with the lead opinion that the major thrust of the entrapment defense in Michigan is to discourage police misconduct which creates the risk that otherwise reasonable, law-abiding citizens will be enticed into violating the law. The government "may not provoke or create a crime and then punish the criminal, its creature." *Casey v United States*, 276 US 413, 423; 48 S Ct 373; 72 L Ed 632 (1928) (Brandeis, J., dissenting).

It is under this definition of entrapment that I believe entrapment occurred in this case. By supplying the scheme, the means, the opportunity, and the controlled substance, the police manufac-

tured a crime here where none had likely existed
before.

However, it is unnecessary in this case to re-
strict our definition of entrapment to situations in
which the police risk overcoming the will of other-
wise law-abiding citizens. In *People v Turner, su-
pra* at 22, we stated that the "real concern" in
entrapment cases is "whether the actions of the
police [are] so reprehensible under the circum-
stances, that the Court should refuse, as a matter
of public policy, to permit a conviction to stand."
"Reprehensible" conduct need not be conduct that
would induce a law-abiding reasonable person to
commit crime. The definition of entrapment set
out in *Turner* condemns any "reprehensible" po-
lice conduct which "public policy" requires a court
to condemn.

My opinion that the undercover scheme em-
ployed here involved such government overinvolve-
ment as to impermissibly manufacture crime is
sufficient to affirm the lower courts. However, I
also agree that other "reprehensible" elements of
this scheme were appropriately found to violate
public policy and lead to entrapment, such as the
introduction of actual narcotics into the jail[6] and
provision of authority to an adolescent to choose
the targets of the operation.[7] The touchstone of our
entrapment defense is not, as the lead opinion
suggests, merely to discourage police conduct
likely to instigate or create a criminal offense.
Rather, the underlying theoretical premise of this
state's entrapment defense has been, and should
remain, an inquiry into "[t]he crucial question

[6] See part v.

[7] See part v. Note, however, that the use of Quinton Varner in this
case also violated the "reasonable person" test because he was al-
lowed to select any target, whether otherwise law-abiding or not, and
was not mature enough (or supervised enough) to ensure he would not
overcome the will of otherwise law-abiding citizens.

. . . whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." *Sherman* at 382 (Frankfurter, J., concurring in the result).

In noting that Michigan's entrapment defense is designed to protect our courts from the taint of any "reprehensible" police conduct, I do not, as the lead opinion suggests, "design[ ]" a new defense. *Ante,* p 76. This Court's first pronouncement of an entrapment defense in *Saunders v People,* 38 Mich 218, 223 (1878), condemned the police conduct there involved as "scandalous and reprehensible," though it was clear that the police did nothing to risk the instigation or creation of a criminal offense by a hypothetical reasonable person.[8]

Likewise, when this Court adopted the objective entrapment defense in *Turner,* we clearly did not limit its application as the lead opinion attempts to do today. Commentators interpreting *Turner* have specifically noted that this Court defined entrapment as both conduct likely to instigate criminal behavior from a "reasonable person" and conduct which, from a broader policy perspective, is otherwise "reprehensible." See 1976 Annual Survey of Michigan Law, Grano, Criminal Procedure, 23 Wayne L R 517, 555-556 (1977); note, *The Michigan entrapment defense: Review and analysis,* 61 J of Urban L 287, 295-296 (1984).

---

[8] The fact that the police conduct at issue in *Saunders* could scarcely be called "scandalous" today does nothing to eviscerate the importance of a "reprehensibility" element in our entrapment defense. By its very definition, the objective entrapment defense is designed to discourage police conduct that falls below standards "to which common feelings respond." *Sherman* at 382. *Saunders'* application of the entrapment defense would be inappropriate today precisely because it is anachronistic. "[C]ommon feelings" regarding "the proper use of governmental power" are naturally not the same in 1990 as they were in 1878. *Sherman* at 382.

The lead opinion itself strays from a strict application of a hypothetical reasonable person entrapment test when it bases its holding, in part, on the fact that these defendants are prison guards "trained in law enforcement [and] sworn to uphold the law . . . ." *Ante,* p 93. In fact, the lead opinion completely recasts the test it espouses when it holds that the police conduct here was "insufficient to induce or instigate the commission of a crime *by the average person, similarly situated to these defendants . . . .*" *Ante,* p 90. (Emphasis added.)

I agree that the standards defining entrapment often shift with the status of the defendant. For example, it would certainly constitute entrapment if undercover police officers tried to entice recovering addicts with narcotics at the entrance of a substance abuse clinic, while an attempt to sell drugs in a corporate office known to harbor narcotics activity would present a much closer question. The difference between those two scenarios has little, if anything, to do with the instigation of criminal activity by those "not ready and willing to commit it." In fact, recovering addicts might be the class of individuals *most likely* to commit a narcotics crime. Rather, the first scenario, far more than the second, involves a completely inappropriate attempt to prey on the weakness of a target. That element makes the scheme "reprehensible" because it "falls below standards, to which common feelings respond, for the proper use of governmental power." *Sherman* at 382. It is reprehensible because societal standards, or "common feelings" would regard such governmental activity as wholly inappropriate, not because it risks overcoming the will of a hypothetical reasonable person.

III

The task of defining which police conduct is

"reprehensible" is far from easy. However, it is
not impossible. Like most legal standards, "repre-
hensibility" depends largely on the facts of a given
case. It is a standard which has been defined and
developed by case precedent. Case law, especially
case law from other jurisdictions, is vital to the
development of entrapment doctrine, because the
entrapment defense is specifically based on "stan-
dards, to which common feelings respond, for the
proper use of governmental power." *Sherman* at
382. One of the most significant sources defining
how "common feelings" have defined these stan-
dards is the decisions of courts in this and other
jurisdictions.


### A


The most significant flaw in the lead opinion's
analysis lies in its failure even to adequately
distinguish the significant body of case law that
has found undercover schemes both "reprehensi-
ble" and "outrageous" where the police supply
contraband to an intermediary who is arrested
after delivering the contraband back to a govern-
ment agent. As Professor Paul Marcus notes in his
volume on entrapment law, "[s]ome of the most
strongly worded condemnations of police conduct
are found in cases involving so-called 'take-back'
sales." Marcus, The Entrapment Defense, § 3.03, p
99.

Perhaps the most compelling condemnation of
schemes in which the government supplies drugs
and invents the crime appears in the dissenting
opinion of *Hampton v United States,* 425 US 484;
96 S Ct 1646; 48 L Ed 2d 113 (1976), the opinion of
the Supreme Court which should carry the most

weight in our analysis since it discusses the legality of these schemes under the objective theory of entrapment. In *Hampton*, the defendant was convicted of distributing heroin after he sold to undercover police officers drugs that a police informer had supplied to him. Writing for the dissent, Justice Brennan borrowed Justice Frankfurter's definition of reprehensible police conduct in *Sherman*, stating that the question is " 'whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power.' . . . Petitioner's claims in this case allege a course of police conduct that, under this view, would plainly be held to constitute entrapment as a matter of law." *Hampton* at 497.

*Hampton* is practically indistinguishable from this case. In *Hampton*, as here, it was not only the government supplying the drugs that Justice Brennan found reprehensible, it was also the governmental instigation of the delivery that manufactured the crime. In this case, the government not only supplied the cocaine and placed it in the defendants' possession, but the government first approached the defendants, asked them to transport the drugs, told them when and where to receive the drugs, and told them how and to whom to deliver them. The lead opinion's claim that the government's actions here were "insufficient to induce or instigate the commission of a crime," *ante*, p 90, simply exceeds the bounds of reason. The only thing the government failed to do to instigate the delivery of cocaine was to chauffeur the defendants personally to the Wayne County Jail.

Applying the objective element of its "hybrid"

entrapment defense,[9] the Supreme Court of New Jersey overturned a conviction in *State v Talbot,* 71 NJ 160; 364 A2d 9 (1976), where an informer, acting in concert with police, supplied heroin to the defendant, who then sold it to an undercover police officer. The court, pointing out that " 'courts will not permit their process to be used in aid of a scheme for the actual creation of a crime by those whose duty is to deter its commission,' " *id.* at 165, ruled that the defendant was entrapped as a matter of law.

> Government properly may use artifice to trap unwary criminals, particularly in its efforts to stamp out drug traffic. However, the methods employed by the State must measure up to commonly accepted standards of decency of conduct to which government must adhere. The manufacture or creation of a crime by law enforcement authorities cannot be tolerated. [*Id.* at 168.]

The Supreme Court of Mississippi quoted extensively from *Talbot* in *Sylar v State,* 340 So 2d 10 (Miss, 1976). In that case, an undercover agent convinced the defendant, after several requests, to take a package of marijuana from the first agent and deliver it to a second agent. "Sylar was made a mere conduit to hand marijuana supplied him by one state agent to another state agent . . . ." 340 So 2d 11. The court ruled that Sylar was entrapped and reversed the conviction.

The Supreme Court of Arizona also condemned undercover schemes in which the government supplied narcotics in *State v McKinney,* 108 Ariz 436, 439; 501 P2d 378 (1972), stating:

[9] The "hybrid" entrapment theory combines elements of both the objective and subjective tests. Under this theory, a defendant can prove entrapment either by showing reprehensible police conduct or by showing a lack of predisposition. New Jersey's hybrid test is currently embodied in NJ Stat Ann, § 2C:2-12.

In cases wherein narcotics are supplied by the state, the courts are in agreement that the state is providing more than the opportunity to commit the offense, they are also providing the very means for the commission of the crime.

The Alaska Supreme Court, also applying the objective theory of entrapment, had a similar view:

"[S]uch conduct does not facilitate discovery or suppression of ongoing illicit traffic in drugs. It serves no justifying social objective. Rather, it puts the law enforcement authorities in the position of creating new crime for the sake of bringing charges against a person they had persuaded to participate in wrongdoing." [*Evans v State,* 550 P2d 830, 844 (Alas, 1976).]

In each of these cases, the courts focused on the reprehensibility of police supplying the contraband and the fact that the government was the architect of the illegal activity. None of the cases discussed the status of the defendants as the lead opinion does here. Rather, they focused on the nature of the government's conduct, as the objective test requires, and found no justification for law enforcement creation of new crimes. Whether the defendants were private citizens or law enforcement personnel, obviously, had nothing to do with whether the government created a crime where one would not have otherwise existed. Therefore, the primary basis offered by the lead opinion by which to distinguish this authority— the status of the defendants—does nothing to distinguish these cases.

After the Supreme Court ruled in *Hampton* that the subjective entrapment defense might permit a reversal of a predisposed individual's conviction only upon a showing of "outrageous" police con-

duct, the United States Court of Appeals for the Third Circuit held that an undercover scheme in which the government supplied the contraband violated this high standard. In *United States v Twigg,* 588 F2d 373 (CA 3, 1978), the court reversed the defendants' convictions on due process grounds where the government arrested them for manufacturing amphetamines after supplying them with a production site, technical expertise, equipment, and raw materials necessary for production of the drug.[10] The court held that "the nature and extent of police involvement in this crime was so overreaching as to bar prosecution of the defendants as a matter of due process of law." *Id.* at 377. The court noted that this case was unlike *United States v Russell,* 411 US 423; 93 S Ct 1637; 36 L Ed 2d 366 (1973), because in *Russell* the defendants had been engaged in the illegal manufacture of drugs before the government participated in their activities. "[W]e also have before us a crime, unlike *Hampton,* conceived and contrived by government agents." *Twigg* at 378. The fact that *Twigg* is not, strictly speaking a case involving entrapment hardly lessens its persuasive authority. The touchstone of our entrapment analysis under *Turner* is whether police conduct is so "reprehensible" as to require dismissal of the charges. *Twigg* dealt with this issue when it held that police conduct very similar to that at issue in this case was not merely "reprehensible," but "outrageous."

Even courts that apply the subjective theory of entrapment have reversed convictions of defendants who were snared as a result of undercover

---

[10] Despite the lead opinion's claim that the federal cases on which I rely "extend its analysis beyond the entrapment defense," *Twigg* is the only federal case I offer that reversed a conviction on some basis other than the entrapment defense. *Ante,* p 86.

schemes in which the government supplied narcotics to the defendants who delivered the substances to other government agents. The best examples of these cases are *United States v West,* 511 F2d 1083 (CA 3, 1975), and *United States v Bueno,* 447 F2d 903 (CA 5, 1971).[11] In *West,* an informer convinced the defendant to join him in a plan to sell narcotics. The informer supplied the narcotics to the defendant and introduced him to a buyer, an undercover police officer. When the defendant sold the undercover officer the narcotics the informer had provided, he was arrested and charged with distributing narcotics. The court stated:

> Frequently, it is permissible law enforcement practice for an undercover agent to obtain evidence of unlawful traffic in narcotics by purchasing heroin from a suspected drug peddler. But when the government's own agent has set the accused up in illicit activity by supplying him with narcotics and then introducing him to another government agent as a prospective buyer, the role of government has passed the point of toleration. Moreover, such conduct does not facilitate discovery or suppression of ongoing illicit traffic in drugs. It serves no justifying social objective. Rather, it puts the law enforcement authorities in the position of creating new crime for the sake of bringing charges against a person they had persuaded to participate in wrongdoing. [511 F2d 1085.]

In *Bueno,* the United States Court of Appeals for the Fifth Circuit overturned a conviction for delivery of drugs where the defendant was enticed by a government informer to participate with him in a

---

[11] It is doubtful that either of these cases remain precedent in federal courts after the Supreme Court made clear in *Hampton* that police conduct might constitute entrapment only if it involves police conduct sufficiently outrageous to violate due process principles.

scheme to transport heroin into the United States from Mexico for sale to a government agent.

> [T]he sales of heroin were made through the creative activity of the government. The Defendant would not have had the heroin to sell if it had not been purchased by the Informer. In fact, this particular heroin would apparently not have been in the United States at all, if it had not been smuggled in by the Informer. [447 F2d 906.]

The court stated that a scheme in which the government buys heroin from itself "greatly exceeds the bounds of reason," *id.* at 905, and held that the defendant was entrapped.[12]

The cases cited above represent a small number from other jurisdictions which have noted the existence of an entrapment or "governmental misconduct" defense where the government supplied both the scheme and the means by which crimes were committed. See also *United States v Mahoney,* 355 F Supp 418, 423, 426-427 (ED La, 1973); *United States v Chisum,* 312 F Supp 1307, 1312 (CD Ca, 1970); *People v Strong,* 21 Ill 2d 320, 325-326; 172 NE2d 765 (1961); *State v Sainz,* 84 NM 259, 261; 501 P2d 1247 (1972); *Lynn v State,* 505 P2d 1337, 1342 (Okla Crim App, 1973); *United States v Oquendo,* 490 F2d 161, 161-162, 164 (CA 5, 1974); *United States v Hayes,* 477 F2d 868, 872-873 (CA 10, 1973); *United States v Rodriquez,* 474 F2d

---

[12] Both *Bueno* and *West* focused on the genesis of the crimes as "the creative activity of the government," *Bueno* at 906, and not the status of the defendants. Had Bueno been a customs official as the lead opinion posits, there is no reason to believe that the government's role in creating the crime would have been any less. Therefore, there is no basis in the lead opinion's assumption that the case might have come out differently. In fact, had Bueno been a customs official, his case might have been stronger because it is reasonable to assume that it would take more governmental effort to convince a law enforcement official to commit a crime than it would to similarly convince Bueno, "a narcotics addict." *Id.* at 904.

587, 589 (CA 5, 1973); *United States v Dillet,* 265 F Supp 980 (SD NY, 1966); *United States v Silva,* 180 F Supp 557 (SD NY, 1959); *State v Boccelli,* 105 Ariz 495; 467 P2d 740 (1970); *People v Dollen,* 53 Ill 2d 280, 282-285; 290 NE2d 879 (1972); *People v Carmichael,* 80 Ill App 2d 243; 225 NE2d 458 (1967); *State v Overmann,* 220 NW2d 914 (Iowa, 1974); *People v Jones,* 73 Ill App 2d 55; 219 NE2d 12 (1966).

The overwhelming number of cases that have condemned police investigations in which the police supply the plans and means for the commission of a crime challenges the lead opinion's claim that "it is difficult to set forth precisely a definition of the kind of law enforcement measures that shock the sensibilities of the courts." *Ante,* p 93. These cases present us with just such a definition —when the police supply a plan and the means for the commission of a crime, they have engaged in conduct which courts will not countenance. These cases clearly illustrate "standards, to which common feelings respond, for the proper use of governmental power." *Sherman* at 382. They define the government action here as entrapment.

B

Our Court of Appeals, employing the objective theory, has also criticized undercover schemes in which the government is both the supplier and ultimate recipient of narcotics. Citing *Bueno* and *West,* the Court held that such a scheme constituted entrapment in *People v Stanley,* 68 Mich App 559, 564; 243 NW2d 684 (1976).

> There can be no doubt that if defendant obtained heroin from Upton, a police informant, and later sold the same heroin back to Upton, his

conviction for that sale would be invalid. It is difficult to conceive of a clearer instance of manufactured crime, of "police conduct . . . [that] falls below standards, to which common feelings respond, for the proper use of governmental power."

The Court ordered the case remanded for a hearing to allow the defendant a chance to prove his claim that the drugs he was convicted of selling to an informer were supplied to him by that same informer. As the lead opinion points out, however, another panel of the Court of Appeals in *People v Roy,* 80 Mich App 714; 265 NW2d 20 (1978), held that an undercover operation in which government agents operate on both ends of a supposed drug transaction is not entrapment per se. Whether such a scheme constitutes entrapment depends on the facts of each case.

The differences in the facts of *Roy* and *Stanley* illustrate the element of these types of undercover schemes that makes many such operations "reprehensible": Impermissible undercover schemes manufacture crime. In *Stanley,* the defendant alleged that law enforcement officials instigated the narcotics transactions for which he was convicted. In *Roy,* however, the Court found it significant that the investigation focused on an ongoing drug smuggling operation, and, further, that specific individuals had been identified as targets already involved in the drug trade before beginning the undercover operation.

Thus, while schemes in which the government is both the purchaser and seller of drugs do not constitute entrapment per se, they can lead to entrapment when they involve government manufacture or instigation of crime. An undercover scheme is permissible when it is used as a means to investigate ongoing crime, but "the Government

cannot be permitted to instigate the commission of a criminal offense in order to prosecute someone for committing it." *Russell* at 439 (Stewart, J., dissenting). "The applicable principle is that courts must be closed to the trial of a crime instigated by the government's own agents." *Sorrells v United States,* 287 US 435, 459; 53 S Ct 210; 77 L Ed 413 (1932) (Roberts, J.).

The lead opinion simply fails to distinguish the substantial body of authority from federal and state courts which has condemned as impermissible government manufacture of crime undercover operations in which the police provide both the contraband and the plan by which a defendant commits a crime. The bottom line in all these cases is the government manufacture of crime. This government manufacture of crime violates objective entrapment principles because it creates the substantial risk that persons uninvolved in criminal activity and otherwise unwilling to engage in criminal activity will be enticed into playing a role in a governmentally instigated crime. When Quinton Varner was turned loose in the Wayne County Jail, the government created the risk that sheriff's deputies who had never engaged in the jailhouse drug trade or contemplated doing so might be enticed to violate the law.

IV

The lead opinion ignores the element of government instigation when it equates the undercover scheme in this case with an ordinary "drug transaction." *Ante,* p 91. In an ordinary drug transaction, an undercover officer purchases narcotics from a person who is already in illegal possession of the drugs or, in some instances, undercover officers might sell actual or facsimile narcotics to a

person in the illicit business of purchasing those narcotics. In the undercover scheme in this case, however, there was never an actual purchase or sale. Although jail officials had reason to believe that an uncertain number of unidentified guards were engaged in the drug trade, they sought out particular individuals who they had no reason to believe were already engaged in narcotics trafficking and convinced them to transfer the drugs from one police agent to another.

At the heart of this scheme was precisely the "intolerable conduct" condemned in *West.* "[I]t puts the law enforcement authorities in the position of creating new crime for the sake of bringing charges against a person they had persuaded to participate in wrongdoing." 511 F2d 1085. Instead of *investigating* criminals and arresting them, the police here *created* criminals and arrested them. Their scheme did not merely create an opportunity for these defendants to involve themselves in wrongdoing, they hatched an illegal plot and provided the illegal substances. In the name of stemming the flow of narcotics into the jail, they created new avenues for the transportation of the substance in order to arrest the new conduits. Instead of taking the time and effort to discover the preëxisting channels by which cocaine entered the jail, the police allowed a sixteen-year-old felon to create new channels that they could then arrest.

v

While I agree with the Court of Appeals in *Roy* that not all undercover schemes in which the government is both the supplier and recipient of contraband are entrapment per se, there are three elements to the scheme employed here which the

trial court correctly identified as distinguishing this case from *Roy* and making this scheme reprehensible.

First, in the name of stemming the flow of narcotics into the Wayne County Jail, the police officers sent actual narcotics into the jail when a facsimile of the drug would have been sufficient. Allowing actual narcotics to travel into the jail and remain for a period of time in the possession of a sixteen-year-old inmate was a risk not justified, given the obvious reason for using actual drugs: The police wished to catch the guards committing the greater felony of delivery, rather than the lesser felony of attempt.

Second, and more important, it was unreasonable for the police officers in charge of this investigation to vest in Quinton Varner, a sixteen-year-old felon, the unfettered power to choose the targets of the operation. The lead opinion is correct in pointing out that the informers upon whom the police necessarily depend are seldom model citizens. However, in this undercover operation, Quinton Varner was far more than an informer.

In *People v Duis,* 81 Mich App 698, 702-703; 265 NW2d 794 (1978), the Court of Appeals ruled that allowing an informer unfettered discretion to select the targets of an undercover operation constituted reprehensible police conduct.

> In the instant case . . . the police had not focused on a particular subject. The police approached [the informer] because he was in a vulnerable position and because they assumed he knew and could contact drug dealers. The police did not investigate defendant to ascertain if he was a drug dealer. By failing to adequately supervise [the informer's] activity, the police allowed him to select any victim he wished. The employment of [the informer], a convicted felon, awaiting

trial on yet another felony, to induce defendant to sell drugs offends decent standards of law enforcement. It is precisely the overreaching police conduct condemned in *Turner.*

The circumstances of this case present facts more reprehensible than those in *Duis.* As an adolescent, Quinton Varner lacked the maturity that would justify giving him the ability to select which individuals he would try to subject to prosecution for a felony carrying a twenty-year penalty. Nor should he have been trusted to approach his targets in a manner mindful of the rights of those individuals.

It was particularly unreasonable to allow an inmate to select the targets of an undercover operation inside a penal institution. The society inside a jail or a prison is highly fractured; individuals within such institutions, particularly individuals engaged in illicit activities, often develop intense loyalties for those whom they consider friends, and strong distrust and dislike for those perceived as enemies. When the police officers allowed Quinton Varner to select the targets of the operation, they must have recognized the probability that Quinton Varner would be selective in his work. Rather than constructing an operation that would capture those guards already engaged in illicit drug trade and, it would be hoped, those at the center of that trade, the police officers created a situation in which Quinton Varner was allowed to subvert any individual he wished, without regard to that individual's previous involvement in the drug trade. Meanwhile, Quinton Varner was free to leave untouched those individuals whom he chose not to see arrested, regardless of whether those individuals were amongst those

most responsible for the presence of drugs in the
Wayne County Jail.[13]

Third, the trial court noted the unreasonable-
ness of allowing Quinton Varner to approach par-
ticular guards of whom the police had no reason-
able suspicion.

The question whether police officials require
either reasonable suspicion or probable cause prior
to the institution of an undercover operation has
been considered on several occasions within this
jurisdiction. In *People v Wright (On Remand),* 99
Mich App 801, 817; 298 NW2d 857 (1980), the
Court of Appeals determined that police officials
do not need probable cause prior to beginning an
undercover investigation. See also *People v Kil-
lian,* 117 Mich App 220, 223; 323 NW2d 660
(1982).[14] Cf. *People v Reynolds,* 139 Mich App 471;
362 NW2d 763 (1984).

I agree that under the subjective theory of en-
trapment, the issue of reasonable suspicion is irrel-
evant to a defendant's predisposition to commit a

[13] The critique offered by the lead opinion, *ante,* pp 84-85 n 13, of
my selective prosecution argument directly supports my view. The
lead opinion quotes Seidman, *The Supreme Court entrapment, and
our criminal justice dilemma,* 1981 Sup Ct R 111, 146, for the
proposition that "we regularly rely upon political checks to guard
against abuse." I agree that *ordinarily* our criminal justice system
guards against selective and discriminatory prosecution by relying on
police and prosecutorial supervision by elected officials in the execu-
tive branch of government. It is *precisely the absence of the super-
vision* that made reliance on Varner's discretion reprehensible. Var-
ner was not an employee of any politically accountable executive,
and, worse yet, he was not monitored in his selection of targets by
any such politically accountable person. He could approach anyone he
chose, and ignore anyone he chose, without having to explain his
decisions to anyone.

[14] For a discussion of the role of reasonable suspicion entrapment
defense, see 1 LaFave & Israel, Criminal Procedure, § 5.4(b), pp 427-
429; Park, n 5 *supra* at 196-198; Dix, *Undercover investigations and
police rulemaking,* 53 Tex L R 203, 248-255 (1975); Whelan, *Lead us
not into (unwarranted) temptation: A proposal to replace the entrap-
ment defense with a reasonable-suspicion requirement,* 133 U Pa L R
1193, 1216-1221 (1985); Garcia, *1985 Annual survey of Michigan law:
Criminal procedure,* 32 Wayne L R 427, 463-464 (1986).

crime. However, reasonable suspicion is a legiti-
mate consideration under the objective theory of
entrapment, where the primary focus of the de-
fense rests upon the nature of the state's law
enforcement tactics.[15] Reasonable suspicion is an
especially important element of inquiry when a
defendant claims to have been entrapped in an
operation in which the government is both the
supplier and recipient of contraband. It was the
existence of a reasonable suspicion regarding the
particular defendants in *Roy* that, in part, caused
the Court of Appeals to sanction the scheme uti-
lized there. Given the inherent danger that these
undercover schemes will manufacture crimes
rather than discover them, the existence of reason-
able suspicion helps ensure that the individuals
caught were merely given an opportunity to com-
mit crime by the police, rather than made crimi-
nals through police conduct.

It is not a necessary condition precedent, nor
would it be a pragmatic requirement that law
enforcement agencies establish reasonable suspi-
cion regarding each and every suspect prior to
commencing an undercover operation. However, in
this case, the trial court was correct in ruling that
among the factors making the police conduct re-
prehensible was the lack of reasonable suspicion
with regard to *any* defendant.

VI

The trial court's judgment in this case should be
upheld unless it is clearly erroneous.

> "A finding is 'clearly erroneous' when although
> there is evidence to support it, the reviewing court

---

[15] I, therefore, disagree with the Court of Appeals decision in
*Reynolds.*

on the entire evidence is left with the definite and
firm conviction that a mistake has been commit-
ted." [*Tuttle v Dep't of State Hwys,* 397 Mich 44,
46; 243 NW2d 244 (1976).]

I am left with the "definite and firm conviction"
that the lead opinion overlooks this standard of
review. The trial court found that the defendants
were entrapped in a scheme in which they were
merely conduits for drugs supplied by and deliv-
ered to the government, in which the police intro-
duced actual narcotics into the Wayne County
Jail, and in which a sixteen-year-old felon was
allowed to select the targets of the scheme regard-
less of the absence of any reasonable suspicion
with regard to any particular defendant. In com-
ing to its decision, the trial court relied upon
binding precedent in this state, *Turner, Stanley,
Roy,* and *Duis,* and its decision is firmly in line
with the decisions of the courts of other jurisdic-
tions. This decision was scarcely clearly erroneous;
I believe it was clearly correct. I would affirm.