Clarence LYNN, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–16645.

Court of Criminal Appeals of Oklahoma.

Jan. 24, 1973.

Larry M. Weber, Altus, for appellant.

Larry Derryberry, Atty. Gen., Jeff L. Hartmann, Asst. Atty. Gen., for appellee.

## DECISION AND OPINION

BRETT, Judge:

Appellant, Clarence Lynn, hereafter referred to as defendant as he appeared at trial, was represented by court appointed counsel and was convicted by a jury in the District Court of Jackson County, Oklahoma, Case No. CRF–70–124, for the offense of unlawful sale of a stimulant. He was sentenced to serve five (5) years imprisonment and appeals.

Defendant argues his appeal under five propositions. The first one. asserts that the trial court committed error when defendant's motion to strike the case from the docket was denied. Defendant was afforded a preliminary examination on Janu-

ary 8, 1971, after which he was bound over to stand trial. On January 12, 1971, defendant, while being formally arraigned, requested his statutory time to plead, so the following day, January 13th, he appeared with counsel and entered a plea of not guilty; and at the same hearing, defendant filed his motion to obtain the transcript of the preliminary hearing forma pauperis, which motion was granted. Defendant's trial was set on the docket for January 18th at which time the transcript of preliminary examination was delivered to defense counsel.

On January 18th defendant filed his motion to strike the case from the docket for the reason he had not been allowed at least ten days from the date of arraignment to prepare for trial, arraignment having been on January 13th; and also because defense counsel had just been provided with the copy of the transcript of preliminary examination. Defendant's motion was denied and trial was commenced the following day, January 19th. The record reflects further that defendant served a subpoena upon one Arthur Parks, who failed to appear to testify; and on January 19th the trial court entered a bench warrant for his arrest.

In support of this proposition defendant relies on this Court's decision in Mitchell v. State, Okl.Cr., 395 P.2d 814 (1964), wherein it was stated:

"Although no definite time between time of arraignment and time of trial is fixed by law, ordinarily, felony cases should not be assigned for trial in less than 10 days after plea is entered." At page 816. See also: Reynolds v. State, 60 Okl.Cr. 92, 61 P.2d 269 (1936).

■ The Attorney General argues in his brief that the defendant "had actual notice of the charge . . . more than one month prior to trial"; and, "The defense did not ask that a reasonable continuance

be granted." But neither argument answers the defendant's complaint. The transcript of preliminary examination was the tool with which defense counsel could properly cross-examine the State's witnesses; and notwithstanding the fact that "defense counsel made extensive use of the preliminary transcript to cross-examine witnesses for the State.", as argued by the Attorney General, one day to study 139 pages of transcript is not reasonable. Also, whether to strike the case from the docket, or whether to reset it at the tail of the docket, was a decision for the trial court to make. Under the circumstances revealed by the record, the case should have been at least reset at the tail of the docket, which would have satisfied defendant's request, and would have more nearly met the reasonable time requirement. Were this a close case, this denial would no doubt constitute reversible error.

The facts in this case reveal that two undercover agents were being used by the Jackson County Sheriff, Mr. Jay Lowell, a specially hired agent, and Mr. Sid Cookerly, an agent with the Oklahoma Bureau of Investigation. Arthur Parks and Nancy Standerfer were both informers used by one or both of the agents. Nancy Standerfer received pay from Agent Cookerly, but Parks was not a paid informer. At one time defendant either offered, or was requested, to be an informer for Agent Cookerly. But because defendant did not provide the information desired, the agent became provoked at him and disavowed his services.

For some reason or another,[1] Arthur Parks went to Weatherford, Oklahoma, on December 8, 1970, where he located the defendant and told defendant that he would assist defendant in "hiding out," because defendant was allegedly being sought by either the police or Agent Cookerly. So, on December 9th informer Parks took defendant to a house which Parks rented, at

---

1. It appears from the record that Agent Cookerly may have purposely sent Parks to Weatherford to locate the defendant. Arthur Parks testified concerning his going to Weatherford, "I was provided transportation [by] Sid Cookerly." (T.E.– 157).

1101 North Hudson in Altus, Oklahoma. That same evening Arthur Parks brought to the house at 1101 North Hudson, four packages of LSD containing twenty-five tablets each, and one package of mescaline containing twenty tablets. Parks testified that after he distributed the tablets to the various people at the house without any charge, he told them not to sell any of it; however, the other witnesses testified that he made no such admonition.

On December 10th the Sheriff of Jackson County called Agent Sid Cookerly to come to Altus to assist in a narcotics investigation. Cookerly notified Nancy Standerfer in Oklahoma City, who was his paid informer, to come to Altus to assist him; and she arrived at the Sheriff's office that evening. At a meeting in the Sheriff's office that evening, concerning how the "buy" was to be accomplished, Nancy Standerfer was instructed to go to Thelma's Cafe—which local drug users frequented—and make a contact. Among those present at the meeting in the Sheriff's office, other than Nancy Standerfer, were: Arthur Parks, the other informer; Jay Lowell, the Special Agent; and Sid Cookerly, the Bureau Agent. The testimony indicated Arthur Parks was "in and out" of the room, but the established fact was that he was there. At the conclusion of the meeting Nancy Standerfer went to the cafe, and Arthur Parks returned to "his house" at 1101 North Hudson.

Soon after Parks arrived at "his house," Parks told the others that he was hungry and wanted some food from Thelma's, so it was decided someone would go to Thelma's Cafe and pick up an order of food. Gordon Spriggs went to the cafe to get the food. While Spriggs was there, Nancy Standerfer said to him, "come over here, I want to talk to you." Consequently, Spriggs and Nancy became acquainted. Having made her contact, both of them left the cafe together and went to 1101 North Hudson. While Nancy was at the house Gordon Spriggs gave her a tablet of LSD, which she put in her mouth and attempted to imbed it in her "Bubble-gum," to keep from becoming "high" on LSD. But notwithstanding her efforts, some of the LSD entered her system. She testified she stayed awake all night, being attended by Agent Cookerly. The testimony revealed also that Arthur Parks had a room at the Sagmar Motel, where Nancy was staying, even though he rented the house at 1101 North Hudson.

On the morning of December 11th, at about 11:50 a. m., Nancy Standerfer and Arthur Parks left the motel together and went to the house at 1101 North Hudson. While they were there defendant asked Nancy Standerfer "how she liked the LSD." She replied that it was all right and said that "she would like to have another one for later." Nancy testified that defendant said, "wait a minute"; and he went to where Gordon Spriggs was, for about a minute or two. She related that he returned and removed a plastic package from his pants' pocket and gave her one LSD tablet, for which Nancy gave defendant two one-dollar bills; she said that defendant put the bills in his pocket. However, both Gordon Spriggs and defendant testified that Spriggs did not give defendant a package of LSD, but instead he gave defendant only one LSD tablet to deliver to Nancy Standerfer. Likewise, they both testified that defendant gave the two one-dollar bills to Spriggs. It was for that alleged sale of LSD defendant was later arrested, tried, and convicted.

On December 11th, when the arrests were made at 1101 North Hudson, defendant arrived while the arrests were in progress. Defendant was prevented from leaving by Jay Lowell, who frisked him for weapons and found none. When defendant was taken into the house he insisted that the police search him. Finally, one of the officers did search defendant, but not immediately upon demand. When defendant was searched no narcotics were found on him. Defendant was not arrested at that time, but instead he was instructed by Jay Lowell to report to the Sheriff's of-

fice. Defendant testified that at the Sheriffs' office, Jay Lowell took him to an investigation room and told defendant, "I want you out of my town by tomorrow morning." Defendant left and went back to Weatherford. Defendant was later arrested in Weatherford on the night of December 14, 1970, and was returned to the Jackson County Jail.

When Arthur Parks, the informer, testified he admitted that he had talked to Agent Cookerly before going to Weatherford; that he went to Weatherford to find the defendant; and when he found the defendant, he told defendant he was in trouble; so, Parks offered and did take defendant to "his house" in Altus. Parks admitted that he was involved in taking the LSD and mescaline tablets to "his house" at 1101 North Hudson and distributed them among the people staying there. He also testified that he was at the Sheriff's office during the progress of the meeting with Nancy Standerfer, but he denied that he was a part of the meeting. He admitted to being an informer, but not a "paid informer." He testified that it was he who said he was hungry, "and I wanted to get something to eat out at Thelma's." Parks admitted being in the house when the alleged sale occurred, but said he did not see it being made.

It is not necessary to summarize the testimony of all the witnesses, because the validity, or invalidity, of this conviction revolves around the testimony of the informers. The tablet examined by the Oklahoma Bureau of Investigation proved to be LSD; and Special Agent Lowell and Agent Cookerly testified concerning their part of the investigation.

Defendant's fifth proposition argues that he was entrapped into making the alleged sale of LSD. The Attorney General argues in his brief, "This Court has clearly held that one who commits a crime is not entitled to the defense of entrapment when that person was ready and willing to commit the crime and officers merely present an opportunity for the defendant to commit the act." The Attorney General's statement is correct, unless it is shown that the officers—or their agent—provide both the opportunity and the means for committing the alleged crime.

In the instant case, State Bureau Agent Sid Cookerly testified on cross-examination: (T.E.–38.)

"Q. What is your acquaintanceship with Mr. Parks?

"A. Mr. Parks has worked as an associate of mine at various times."

With reference to the conference had in the Sheriff's office on the evening of December 10, 1970, Agent Cookerly was asked, "Was Arthur Parks present at that time?" Cookerly answered, "Part of the time." (T.E.–42.) Concerning Arthur Parks' knowledge of instructions given to Nancy Standerfer to go to Thelma's Cafe to make a narcotics contact, Agent Cookerly was asked, "Was Arthur Parks aware that this was part of the plan?" He answered, "It is quite possible."

During cross-examination of Agent Cookerly, concerning who was present at the December 10th Sheriff's meeting, he was asked: (T.E.–42.)

"Q. Was Arthur Parks present at that time?

"A. Part of the time.

"Q. Why was he present?

"A. He was with Mr. Lowell; I think Mr. McDonald was present at the time. He was in and out of the sheriff's office.

"Q. Was he providing you information as far as drug activities in this county at that time?

"A. He provided Mr. Lowell with information, sir. I sat in on some of the information. To say he furnished me information, in general terms I would; from an informant standpoint, I wouldn't, no sir."

Arthur Parks was subpoened by the defense to testify, but failed to report as directed; so the court issued a bench war-

rant for his arrest. On direct examination he was asked his whereabouts on December 8, 1970, and answered, "Probably at my house. . . . [at] 1101 North Hudson." Counsel asked, "You say 'my house'; is this your house up there?" He replied, "Mine and some other people." Contrary to what Agent Cookerly testified, Parks related that when he went to Weatherford to see the defendant, he was provided transportation by Agent Cookerly. He testified concerning defendant, "He wanted to get out of Weatherford because it was hot; and I said he was welcome to come back and stay at my house. I kinda liked the guy and I didn't want to see him get jacked around, and I told him he could come back with me." When Parks was asked, "Did you come back to Altus?" this witness said, "That's right." The following series of questions and answers appear at page 161:

"Q. All right, Mr. Parks. Did you bring any drugs over there to 1101 North Hudson?

"A. Did I myself?

"Q. Yes, you personally.

"A. I was involved with drugs over at that house; it involved bringing drugs over to that house.

"Q. What quantity?

"A. About a hundred tabs.

"Q. A hundred tabs of what?

"A. LSD.

"Q. Anything else?

"A. Some mescaline too."

This witness testified to his being present at the Sheriff's office on the night of December 10th, and that he went to 1101 North Hudson when he left the Sheriff's office. The questions and answers on page 162 are:

"Q. Arties, did you place a food order down at Thelma's on the night of December 10?

"A. I didn't; someone else called. I don't know who it was though.

"Q. Did you suggest where they might buy some food?

"A. I said I was hungry and I wanted to get something to eat out at Thelma's."

Parks admitted that he knew Nancy Standerfer was coming to Altus, but denied that he knew she was at Thelma's Cafe when he said he wanted some food from Thelma's. Parks was asked, "When did you first see her on December 11th? I'm not talking about the early morning hours, but later on in the morning. Did you see her at any time December 11th?" Parks answered, "I was with her part of the night." He related that he also stayed at the Sagamar Motel. He admitted that he went with Nancy Standerfer to 1101 North Hudson on the morning the alleged LSD sale occurred.

On cross-examination, Mr. Parks was asked by the prosecutor, "Mr. Parks, as a matter of fact you have never worked for Mr. Cookerly, or any other officer; you are merely an informer. You give them information if you think they can use it?" Mr. Parks answered, "That's correct."

In Wharton's Criminal Law, § 132, p. 286, the following statement on entrapment appears:

"When the criminal intent originates in the mind of the entrapping person, and the accused is lured into the commission of the offense charged in order to prosecute him therefor, it is the general rule that no conviction may be had, though the criminality of the act is not affected by any question of consent."

In Riddle v. State, Okl.Cr., 373 P.2d 832, 841 (1962), this Court quoted from an earlier case, Rider v. State, 53 Okl.Cr. 393, 12 P.2d 552 (1932), as follows:

"A decoy may be used to detect or entrap a criminal, and as such may afford an opportunity for a criminal to commit a crime, and may be present apparently assisting in the commission of the crime, and such action on the part of the decoy will not constitute a defense. But, when

the decoy first suggests, initiates, or induces the commission of the crime, or, as it sometimes said, 'artificially propagates' the crime, and thereby lures an otherwise innocent person to aid and abet him, or where the decoy himself does some act essential to the crime charged, a sound public policy will not uphold a conviction."

Two questions arise in this case. Would defendant have sold the LSD tablet to Nancy Standerfer had not he been taken to 1101 North Hudson by Arthur Parks? And, would defendant have been convicted had not Arthur Parks furnished the LSD? Considering the facts contained in the record before this Court, the answer to both questions must be, "no."

In Riddle v. State, supra, this Court also quoted from Finley v. State, 84 Okl.Cr. 309, 181 P.2d 849 (1947), as follows:

"If an officer or decoy suggests the commission of a crime, or artificially propagates its inception, or lures another otherwise innocent person to commit the crime, and the decoy performs an act essential to the crime, a conviction cannot be had on such a basis for that is entrapment."

The record is clear that Arthur Parks was not a "paid informer," but it is also clear that Parks was an informer and that he had sufficient association with the law enforcement officials which permitted him to walk freely in and out of the planning meeting with Nancy Standerfer on December 10th. The record is also clear that Arthur Parks provided transportation for defendant to go to 1101 North Hudson; and that the LSD reached 1101 North Hudson through the efforts of Arthur Parks, after defendant arrived there. It is clear also, that Arthur Parks and Nancy Standerfer were working together for the same ultimate purpose. That purpose was to set-up the arrest of defendant for the sale of LSD.

In People v. Carmichael, 80 Ill.App.2d 293, 225 N.E.2d 458, the Illinois Court held that when the informer provided the narcotics with which the sale was made, the conviction must fail. The second paragraph of the syllabus to that decision states:

"Where defendant testified that a police informer supplied him with narcotics which were subject of illegal sale, and testimony of informer did not controvert defendant's claim, nor did any other testimony, defendant charged with unlawful possession and unlawful sale of a narcotic drug, proved entrapment and should have been discharged."

In United States v. Bueno, 447 F.2d 903 (5th Cir. 1971), the defendant was supplied heroin by a government informer, but was nonetheless convicted for selling the same heroin to the government agent for whom the informer apparently was working, the sales having been arranged by the informer. In United States v. Chisum, 312 F. Supp. 1307 (C.D.Cal.1970), the defendant was supplied counterfeit money by a government agent and then indicted for receiving the counterfeit bills with intent to pass them as genuine. In each case the court held that since the government had supplied the defendant with the contraband, the defendant was entrapped as a matter of law, regardless of the accused's predisposition to commit the crime.

In People v. Strong, 21 Ill.2d 320, 172 N.E.2d 765 (1961), the defendant was convicted for selling heroin to a government agent. The informer left the heroin with defendant saying he would return in about 45 minutes; but when he did later return, he was accompanied by a government agent who gave defendant fifty dollars in marked bills. Defendant told the agent the money belonged to Reynolds, the informer, but Reynolds asked him to keep the money for him. In reversing the conviction, the Illinois Supreme Court stated:

"[W]e cannot condone the action of one acting for the government in supplying the very narcotics that gave rise to the alleged offense. We know of no conviction for sale of narcotics that has been sustained when the narcotics sold were

supplied by an agent of the government. This is more than mere inducement. In reality the government is supplying the *sine qua non* of the offense. . . . [T]he State must be responsible for the actions of their informer, Reynolds, when the defense of entrapment is raised." At 768.

In Gray v. State, 249 Ind. 629, 231 N.E. 2d 793 (1967), reversal of conviction for the sale of heroin resulted because entrapment was found on appeal. The Indiana Court concluded that the "only evidence here shows a plan to lure and entice appellant to violate the law by selling heroin to an informant under a plan devised by law enforcement officials."

 The State argues in its brief, "The record herein supports the allegation that law enforcement officers provided the money and the purchaser for the sale of LSD involved herein. Other allegations of wrongdoing on the part of law enforcement officers are either not supported by the record or are the subject of conflicting testimony." Such statement may be correct as to the law enforcement officers themselves, but the same cannot be said concerning the part informer Parks played in this conviction. Parks' admissions made in direct testimony revealed his wrongdoing, i. e., purposely luring defendant to Altus, Oklahoma; introducing the LSD to the house occupied by defendant and others, as well as other actions which must be imputed to the responsibility of the officers. It is not required that the informer be a paid informer to fulfill the agency role contemplated to meet the entrapment requirements. In addition, there was no showing that defendant had the required predisposition to sell the LSD. It appears from the record that there may not have been any LSD to sell had it not been for the fact that Arthur Parks delivered the 100 tabs of LSD to 1101 N. Hudson.

The part played by Arthur Parks was not denied by the State, except to show that he was not a "paid informer"; and the only rebuttal testimony offered con-

cerned a recorded statement taken from Gordon Spriggs, which the trial court did not allow to be played. It appears clear to this writer that the State's "creative activity," either directly or indirectly, rose to a level substantially more intense and aggressive than the level tolerated by most courts.

Defendant's second proposition asserts: "A defendant who has acted without interest or benefit in an alleged sale of drugs cannot be convicted as a seller even though his conduct may have facilitated the sale where the evidence shows no conspiracy or prearranged plan between the defendant and the seller."

In support of this proposition defendant relies in part on Commonwealth v. Harvard, 356 Mass. 452, 253 N.E.2d 346 (1969), in which the Supreme Court of Massachusetts reversed the decision, stating:

"Defendant facilitated an illegal sale by introducing a willing buyer and seller and by aiding in the physical transfer of drug and money. There is nothing to show that the defendant had any financial interest in the transaction, or was employed by the seller to promote sales." 253 N.E.2d at 348.

The facts in that case revealed that the defendant was contacted by an undercover agent about obtaining some marihuana. After several such contacts, the defendant introduced the undercover agent to one Zacharo. The agent's car and Zacharo's car were parked parallel to each other and three or four feet apart, with the defendant standing between the cars. "Defendant persuaded Zacharo to sell marihuana to Martin [the undercover agent]. Zacharo thereupon handed a plastic bag of marihuana to the defendant, who passed it to Martin in Martin's car. Martin then gave $15.00 to the defendant, who passed it to Zacharo. There was no evidence that the defendant received any of the proceeds of the sale." 253 N.E.2d at 347.

 In the instant case the State's testimony, as well as defendant's testimony,

showed that defendant went back to where Gordon Spriggs was, obtained the LSD, carried it to where Nancy Standerfer was, and handed it to her. The only conflicts of testimony concerned whether defendant obtained from Gordon Spriggs a plastic bag of tablets, or only one tablet; and, whether the defendant kept the two one dollar bills, or gave them to Gordon Spriggs. The State's witness testified that defendant placed the bills in his pocket, but she didn't know whether or not defendant later gave them to Spriggs. Spriggs and defendant both testified that defendant gave the money to him.

The same results were reached in Adams v. United States, 220 F.2d 297 (5th Cir. 1955), wherein that court stated:

> "All of the evidence was quite consistent with [defendant's] acting only as a purchasing agent or messenger instead of as a seller * * * nor was there any evidence that [defendant] profited in any way from the transactions or was associated with her 'connection' in selling narcotics * * *. The verdict of guilty of the offense of selling heroin must have been based upon speculation, and the court should have directed a verdict of acquittal."

This Court held in Cude v. State, 42 Okl.Cr. 357, 276 P. 240 (1929):

> "To sustain a conviction, it should appear not only that the offense was committed, but the evidence inculpating the defendant should do so to a degree of certainty, transcending mere probability or strong suspicion."

In the past it has been the general rule under the prohibition acts, national and state, that one who has acted without interest in the selling cannot be convicted as a seller, even though his conduct may, in fact, have facilitated an illegal sale. See cases collected in notes, 24 L.R.A.,N.S., 268 and 28 L.R.A.,N.S., 334. As this writer views the record before the Court, there was no showing of any conspiracy or prearranged plan between Gordon Spriggs and defendant; nor is there any positive testimony showing that defendant acted other than without interest or benefit in the alleged sale. The only preconceived plan in this case appears to have been one involving Arthur Parks, and the role he fulfilled. That role included the primary function of furnishing the LSD to be later sold to Nancy Standerfer.

We do not consider it necessary to discuss defendant's complaint concerning the Court's instruction number three, defining the term "delivery."

However, notwithstanding the fact that the trial court instructed the jury on the defense of entrapment, that question should have been resolved as a matter of law, under these facts and circumstances. And having not been resolved as a question of law, it is the duty of this Court to review the record to determine whether or not the trial court erred. Just as appellate courts determine as a question of law the issue of a voluntary confession, we must also determine the issue of entrapment. In the instant case we can reach no conclusion other than that which concludes the defendant established the defense of entrapment. The record as a whole tends to show that defendant's only sale was of LSD, supplied to him by the informer Arthur Parks, while Parks was working with the law enforcement officers. This constitutes a valid defense of entrapment, and the defendant should have been discharged. Also, because the evidence produced against defendant, inculpating him as a "seller," is not sufficient enough to reach a degree of certainty and merely shows probability or strong suspicion.

We are therefore of the opinion this conviction must be reversed. It is so ordered.

Reversed and remanded.

BLISS, P. J., and BUSSEY, J., concur in result.