STATE of North Dakota, Plaintiff
and Appellee,

v.

Terry Lee KUMMER, Defendant
and Appellant.

Crim. No. 910138.

Supreme Court of North Dakota.

Feb. 20, 1992.

**438**

John T. Goff (argued), State's Atty., Fargo, for plaintiff and appellee.

Brian W. Nelson (argued) of Nelson Law Office, Fargo, for defendant and appellant.

MESCHKE, Justice.

Terry Lee Kummer appeals from a conviction for possession of a controlled substance with intent to deliver. The conviction arose out of a "reverse sting" operation conducted by officers of the Fargo Police Department and the narcotics division of the State Bureau of Criminal Investigations. Because we believe that the undisputed facts of this case show that the police used unlawful means to induce the crime, establishing entrapment as a matter of law, we reverse.

During the summer of 1990, law enforcement officers learned from two confidential informants that Kummer had been involved in drug trafficking. The informants had themselves been arrested for drug violations, and they agreed to cooperate with the officers in exchange for a favorable recommendation to the state's attorney's office on their prosecutions. Special Agent Daniel Baumann of the Crime Bureau and Officer Donn Weaver of the police department's narcotics division planned a reverse sting, arranging for an informant to make a sale of drugs to a targeted individual.

On September 17, 1990, one of the informants, at the direction of Baumann and Weaver, made a taped telephone call from the police department to Kummer in Anamoose, and asked him when he would be in the Fargo area to take advantage of a "good deal" on cocaine. Kummer expressed an interest, but only if the quality was better than it had been in the past. The informant asked when he should contact Kummer again. Kummer replied that he would contact the informant the following Wednesday. Kummer did not return the phone call.

Baumann and Weaver planned the amount of cocaine to offer to Kummer and set the price at $1,200 per ounce. On September 21, 1990, the informant made another taped telephone call from the police department to Kummer in Anamoose and discussed the price and the quantity of cocaine that Kummer might purchase. Kummer decided to purchase three ounces.

On September 28, 1990, the informant made two more taped telephone calls to

Kummer to plan a date, time, and place for the sale. The informant and Kummer arranged to meet on the evening of September 30, 1990, at Motel 75 in Fargo. Baumann then rented two rooms at Motel 75.

On September 30, 1990, Weaver obtained three ounces of cocaine from the evidence room at the police department. The cocaine had originated from an earlier drug case that had been closed for some time. Weaver divided the cocaine into three one-ounce portions and heat-sealed each portion in plastic bags. Weaver gave the cocaine to Baumann.

Later that day, Baumann and the two informants went to one of the rented rooms at Motel 75. Baumann placed a "body transmitter" on one of the informants and instructed them to tell the front desk personnel to have Kummer, upon his arrival, call before coming to the room. When Kummer called, Baumann gave the three packages of cocaine to the informant who had arranged the transaction, turned on the body transmitter that had been placed on the other informant, and went to the other motel room where officers had set up the receiving surveillance equipment. When the officers heard the informants counting the $3,600 Kummer had given them, they went into the hallway and waited for Kummer to leave the room. Upon leaving the room, the officers stopped Kummer, conducted a pat-down search, and retrieved the three packages of cocaine. The officers also retrieved the money Kummer had given the informants.

Kummer was charged with violation of NDCC 19–03.1–07 and 19–03.1–23, a class A felony, for possession of a controlled substance with intent to deliver. The confidential informants moved out of state and did not testify at trial. Kummer also did not testify. The jury, rejecting Kummer's entrapment defense, returned a guilty verdict. Kummer appealed.

## I. ELECTRONIC SURVEILLANCE

Kummer argues that the trial court erred in failing to suppress the evidence from use of the body transmitter because this electronic surveillance was conducted without a court order.

▉ The procedures for obtaining a warrant-like, ex parte court order for wiretapping or eavesdropping are set forth in NDCC Chapter 29–29.2. A court order authorizing electronic surveillance is not required under all circumstances. Chapter 29–29.2

does not apply to the interception, disclosure, or use of a wire, electronic, or oral communication if the person intercepting, disclosing, or using the wire, electronic, or oral communication:

1. Was a person acting under color of law to intercept a wire, electronic, or oral communication and was a party to the communication or one of the parties to the communication had given prior consent to such interception; ...

NDCC 29–29.2–05(1). Kummer argues that the consent exception to the court order requirement does not legalize the electronic surveillance in this case because the State failed to prove consent. We disagree.

We have not interpreted the consent clause of our statute. Our statute, NDCC 29–29.2–05(1), parallels the language of 18 U.S.C. § 2511(2)(c), the federal eavesdropping statute. The federal courts have established a framework for interpreting the federal statute that provides guidance to us. *See Land Office Co. v. Clapp–Thomssen Co.*, 442 N.W.2d 401, 403 (N.D. 1989). We look to the federal precedents.

The prosecution has the burden of proving that the party's consent was voluntary and uncoerced. *United States v. Kolodziej*, 706 F.2d 590, 593 (5th Cir.1983). The testimony of the informant, however, is not required to prove that the informant consented to the interception. C. Fishman, *Wiretapping and Eavesdropping* § 13(b) (1978 & Supp.1991), and cases collected therein. Generally, the prosecution may meet the burden of proving an informant's consent by simply showing that the informant proceeded with the transaction after knowing that it would be monitored. Annot., *Interception of Telecommunication By or With Consent of Party As Excep-*

*tion ... To Federal Proscription of Such Interceptions,* 67 A.L.R.Fed. 429, 433 (1984); *United States v. Jones,* 839 F.2d 1041, 1050 (5th Cir.1988). *Kolodziej.* The rationale for this is explained in *United States v. Bonanno,* 487 F.2d 654, 658–659 (2d Cir.1973):

> We observe at the outset that the extent of proof required to show that an informer consented to the monitoring or recording of a telephone call is normally quite different from that needed to show consent to a physical search, whether by the defendant himself or by some person in a position to give an effective one. Cf., *e.g., United States v. Viale,* 312 F.2d 595, 601 (2 Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963); *United States v. Como,* 340 F.2d 891, 893 (2 Cir.1965); *United States ex rel. Lundergan v. McMann,* 417 F.2d 519, 521–522 (2 Cir.1969). See generally *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In cases involving physical search, the person alleged to have consented is doing something apparently contrary to his own interests or to those of another who often is in some way connected with him. An informer's consent to the monitoring or recording of a telephone conversation is an incident to a course of cooperation with law enforcement officials on which he has ordinarily decided some time previously and entails no unpleasant consequences to him. Hence, it will normally suffice for the Government to show that the informer went ahead with a call after knowing what the law enforcement officers were about.

This reasoning is persuasive.

■ Where there is an allegation of coercion, the government must show that there has been no undue pressure, threats, or improper inducements. *Kolodziej; United States v. Kirk,* 534 F.2d 1262, 1273 (8th Cir.1976). However, the fact that an informant anticipates favorable treatment or leniency in return for cooperation does not make a consent involuntary. *Jones; United States v. Salisbury,* 662 F.2d 738, 740 (11th Cir.1981). Even promises of immunity from the prosecution in return for an informant's cooperation in conducting electronic surveillance do not make the informant's consent involuntary. *United States v. Dowdy,* 479 F.2d 213, 229 (4th Cir.1973); *United States v. Silva,* 449 F.2d 145, 146 (1st Cir.1971). Only when the consent is the product of improper police conduct, such as coercion or promises which have no realistic basis in fact, is the consent deemed involuntary. *Jones; United States v. Horton,* 601 F.2d 319, 322–23 (7th Cir. 1979); *Kolodziej,* 706 F.2d at 595. There is no reason to believe that the consent here was coerced.

In this case, there is no dispute that the informant who wore the body transmitter was cooperating with authorities in return for a favorable recommendation to the prosecutor. There was testimony that the informants were fully aware of the nature of the transaction at Motel 75. The informant wore the body transmitter during the transaction and it is undisputed that he knew the transaction was being monitored. *See, e.g., Jones; Bonanno.* We conclude that the evidence in this case satisfactorily establishes the informant's consent.

■ Kummer also asserts that we should require exclusion of the evidence obtained as a result of the electronic surveillance based on *State v. Sarmiento,* 397 So.2d 643, 645 (Fla.1981), where the court held that Florida's equivalent to the Fourth Amendment precludes the warrantless interception of a private conversation in the subject's home. However, that section of the Florida Constitution has since been amended to require that it be construed in conformity with the Fourth Amendment. The Florida Supreme Court has concluded that this amendment effectively overruled *Sarmiento. See State v. Hume,* 512 So.2d 185, 187 (Fla.1987). Before that, moreover, a lower Florida appellate court had refused to apply *Sarmiento* to monitoring of a suspect's conversation in his motel room. *Padgett v. State,* 404 So.2d 151, 152 (Fla. Ct.App.1981). Even if an occupant has a reasonable expectation of privacy in his hotel room [*Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964)], Kummer was an invited guest of

the occupants in this case. Kummer has not shown that he had a reasonable expectation of privacy during the three to five minutes he spent in the hotel room as an invited guest. *See,* for example, *People v. Rada,* 141 Misc.2d 218, 532 N.Y.S.2d 973, 976 (1988). We conclude that the trial court properly refused to suppress evidence obtained from this electronic surveillance.

## II. UNLAWFUL MEANS

■ Kummer argues that he was entrapped as a matter of law because the police "had to create and commit a crime," that is, use unlawful means to obtain the drugs for sale to him in order to persuade him to commit a crime. We agree.

■ Entrapment occurs "when a law enforcement agent induces the commission of an offense, using persuasion or other means likely to cause normally law-abiding persons to commit the offense. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment." NDCC 12.1–05–11(2). Any person cooperating with a law enforcement agency is a "law enforcement agent" for purposes of the entrapment defense. NDCC 12.1–05–11(3); *State v. Erban,* 429 N.W.2d 408, 413 (N.D.1988). Entrapment is an affirmative defense that the accused must prove by a preponderance of the evidence. *City of Bismarck v. Nassif,* 449 N.W.2d 789, 796 (N.D.1989). Ordinarily, whether entrapment exists is a question of fact for the jury. *State v. Rehling,* 426 N.W.2d 6, 7 (N.D.1988). But, if no dispute exists over the facts or the inferences to be drawn from the facts, the court may determine the existence of entrapment as a matter of law. *City of Mandan v. Willman,* 439 N.W.2d 92, 93 (N.D.1989). Police use of unlawful means is entrapment.

■ Our entrapment statute employs the "objective" test " 'to determine whether police conduct is sufficiently unsavory to justify an entrapment defense.' " *State v. Pfister,* 264 N.W.2d 694, 697 (N.D. 1978) (quoting from The Working Papers of the National Commission on Reform of Federal Criminal Laws (1970), p. 320). Un-

der the objective test, the focus is on the conduct of law enforcement officials and the effect it would have on the normally law-abiding citizen. *State v. Flamm,* 338 N.W.2d 826, 828 (N.D.1983); *State v. Mees,* 272 N.W.2d 284, 289 (N.D.1978). Predisposition of the accused to commit the crime is irrelevant. *State v. Hoffman,* 291 N.W.2d 430, 432 (N.D.1980). Thus, in order to fashion an entrapment defense under NDCC 12.1–05–11, the accused must establish two elements: that law enforcement agents induced the commission of the crime and that the method of inducement was likely to cause normally law-abiding persons to commit the offense. *State v. Weisz,* 356 N.W.2d 462, 464 (N.D.1984). In this case, the method of inducement was unlawful.

This is the first time that this court has faced the assertion of an entrapment defense where law enforcement officers furnished the controlled substance that brought about the prosecution and conviction of the accused for possession with intent to deliver. Courts from other jurisdictions have taken a dim view of this police conduct.

■ Numerous decisions have declared that, when uncontroverted evidence shows that one police agent provided the illicit drugs that the accused then illegally possessed or dispensed to a second police agent, the defense of entrapment is established as a matter of law. *See United States v. West,* 511 F.2d 1083, 1085 (3rd Cir.1975); *United States v. Mosley,* 496 F.2d 1012, 1015 (5th Cir.1974); *United States v. Oquendo,* 490 F.2d 161, 163 (5th Cir.1974); *United States v. Bueno,* 447 F.2d 903, 906 (5th Cir.1971); *Evans v. State,* 550 P.2d 830, 844–845 (Alaska 1976); *State v. McKinney,* 108 Ariz. 436, 501 P.2d 378, 383 (1972); *Coleman v. State,* 141 Ga.App. 193, 233 S.E.2d 42, 43–44 (1977); *State v. Overmann,* 220 N.W.2d 914, 917 (Iowa 1974); *Tanner v. State,* 566 So.2d 1246, 1249 (Miss.1990); *Froggatt v. State,* 86 Nev. 267, 467 P.2d 1011, 1013 (1970); *State v. Talbot,* 71 N.J. 160, 364 A.2d 9, 13 (1976); *Baca v. State,* 106 N.M. 338, 742 P.2d 1043, 1045–1046 (1987); *Lynn v.*

*State,* 505 P.2d 1337, 1344 (Okla.Ct.Crim.App.1973). The rationale for this rule is clearly explained in *West,* 511 F.2d at 1085:

> Frequently, it is permissible law enforcement practice for an undercover agent to obtain evidence of unlawful traffic in narcotics by purchasing heroin from a suspected drug peddler. But when the government's own agent has set the accused up in illicit activity by supplying him with narcotics and then introducing him to another government agent as a prospective buyer, the role of government has passed the point of toleration. Moreover, such conduct does not facilitate discovery or suppression of ongoing illicit traffic in drugs. It serves no justifying social objective. Rather, it puts the law enforcement authorities in the position of creating new crime for the sake of bringing charges against a person they had persuaded to participate in wrongdoing.

When the police themselves violate the law in order to induce a crime, they employ unlawful means.

The federal decisions cited above predate *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), where a majority of the Supreme Court reaffirmed the "subjective" theory of entrapment as a matter of federal law. Under the subjective theory, entrapment cannot be established if the accused is predisposed to commit the crime. While the federal decisions that we cite have therefore lost their precedential value in federal entrapment cases, the rule announced in those cases is "quite compatible with the existing law of entrapment" in jurisdictions, like ours, that employ the "objective" theory. *Evans,* 550 P.2d at 845. Moreover, even though many of these cases address a "conduit" situation where a government agent or informant provides illegal drugs to the accused who, in turn, sells the drugs to another government agent, this per se rule of entrapment has also been applied to a typical reverse sting situation where the government agent or informant only provides the illegal drugs to the accused. *See Kemp v. State,* 518 So.2d 656 (Miss.1988);

*Barnes v. State,* 493 So.2d 313 (Miss.1986). *But see Moore v. State,* 534 So.2d 557 (Miss.1988) (Affirmance of conviction by equally divided court, where state supplied marijuana for reverse sting). We concur that a per se rule of entrapment should apply here.

There have been attempts to distinguish the conduit cases from the typical reverse sting situation. *See,* for example, *State v. Gessler,* 142 Ariz. 379, 690 P.2d 98, 103 (Ct.App.1984). We find those attempts unpersuasive. It is the conduct of the government agent in furnishing the illegal drugs to the accused, rather than the accused's subsequent sale to another government agent, that is the improper governmental inducement. *See Mosley,* 496 F.2d at 1016 ["a defendant, where entrapment is an issue, may be acquitted for lack of predisposition, or, even though disposed, where the undercover agent supplies him with the contraband" ]; *Oquendo,* 490 F.2d at 163 ["when a defendant testifies that he obtained the contraband from an informer, the government must produce the informer to contradict the defendant's allegations in order to take the case to the jury" ]; *Bueno,* 447 F.2d at 906 [when government supplies the contraband, the accused cannot be guilty of possessing it as a matter of law]; *McKinney,* 501 P.2d at 381 ["[i]n cases wherein narcotics are supplied by the state, the courts are in agreement that the state is providing more than the opportunity to commit the offense, they are also providing the very means for the commission of the crime."]; *Lynn,* 505 P.2d at 1342 [recognizing that the court could not condone the action of one acting for the government in supplying the very narcotics that gave rise to the alleged offense]. It is the improper conduct of the police that is most important.

██ The police tactic of furnishing contraband "lacks the element of *necessity* that has historically been the basis for rationalizing government involvement in the commission of undercover crimes." Comment, *Criminal Procedure: Entrapment Rationale Employed to Condemn Government's Furnishing of Contraband,*

59 Minn.L.Rev. 444, 457 (1974) [Emphasis in original; footnote omitted]. There are sound public policy reasons for adopting a per se rule of entrapment in cases where the police furnish the controlled substance for the crime:

> It seems easy to understand and to explain to police agents, and it seems to give clear guidance about the limits of permissible conduct. Moreover, it seems to strike at a dangerous and unnecessary law enforcement technique. If an agent suspects that a target is dealing in contraband, the agent can attempt to make a decoy purchase from him. There will normally be no need to provide the target with contraband; a person who has been trafficking will have his own sources. Indeed, the fact that an agent found it expedient to provide contraband raises a suspicion that the target was not predisposed.... [T]he rule against furnishing contraband, like the exclusionary rule in search cases, can be seen as a prophylactic rule intended to protect innocent persons from police action intended for the guilty. An agent who feels free to give drugs to targets creates a danger of corrupting the innocent that an agent who merely makes decoy purchases does not.

R. Park, *The Entrapment Controversy*, 60 Minn.L.Rev. 163, 191 (1976) [Footnote omitted]. In addition, if officers and informers are allowed to possess and sell drugs for purposes of trapping users and sellers, there is a chance not only that the drugs will be used by the recipients, including novice users, but also that the drugs will be diverted to illegal channels. *Id.*, at n. 89. The per se rule eliminates any excuse for law enforcement officers or agents to possess controlled substances, except during that brief span between the seizure or undercover purchase and the placement of the drugs in the police evidence locker, thereby facilitating enforcement of anticorruption measures. *Id.*

In this case, Weaver obtained the cocaine from the property custodian at the Fargo Police Department without any written authorization from supervisory personnel. Weaver gave the cocaine to Baumann who turned it over to the informants. No criminal liability is imposed by our Uniform Controlled Substances Act "upon any authorized state, county, or municipal officer, engaged in the lawful performance of their duties." NDCC 19–03.1–37(3). Nevertheless, conduct by a public officer is not justified unless it is "required or authorized by law." NDCC 12.1–05–02. We are unaware of any statutory authority that authorizes a controlled substance confiscated in another drug prosecution to be withdrawn from evidentiary retention, offered for sale, and sold to others. *See* NDCC 19–03.1–23; 19–03.1–36(4) (A controlled substance "taken or detained under this section is not subject to replevin, but is deemed to be in custody of the board or a law enforcement agency subject only to the orders and decrees of the district court...."). *See also* NDCC 19–03.1–39(5). The property custodian testified that he only had written authorization to release controlled substances for examination by a toxicologist, for court proceedings, or for destruction.

Indeed, the Standard Operating Procedures of the Fargo Police Department specifically direct that only "[a] court, prosecuting attorney, or a departmental policy can authorize the disposal of ... property" and that "[n]arcotics, dangerous drugs, and drug implements will be taken to the Toxicology Lab at N.D.S.U. and destroyed in the presence of the property custodian or appropriate designee." Subversion of statutes, rules, or regulations by law enforcement officers, in order to induce a criminal violation, cannot be sanctioned. *Cf. Kelly v. State*, 593 So.2d 1060 (Fla.Ct.App.1992) [accused's due process rights violated when police illegally manufactured "crack" and sold it to accused in reverse sting operation]. We conclude that the police employed unlawful means in this case to induce the accused to commit a crime.

Our entrapment defense " 'is treated primarily as a curb upon improper law enforcement techniques, ...' " *Pfister*, 264 N.W.2d at 697 [quoting Final Report of the National Commission on Reform of Federal Criminal Laws, commentary on § 702

(1971)]. The drafters' official commentary on the entrapment provision of the proposed Federal Criminal Code, from which our entrapment statute was drawn, states:

> The defense of entrapment was devised to counter those activities of the police which are generally regarded as improper means of law enforcement. It has been the sense of the commentators, both scholarly and judicial, that the police are meant to deter or discover, not to foster, criminality. To allow such conduct to pass unchecked would be to give silent comfort to corrupting influences within the police department and within society at large.

I Working Papers of the National Commission on Reform of Federal Criminal Laws, *Comment on Entrapment: Section 702*, at p. 314 (1970). We agree with the observation of the court in *Talbot*, 364 A.2d at 13:

> Government properly may use artifice to trap unwary criminals, particularly in its efforts to stamp out drug traffic. However, the methods employed by the State must measure up to commonly accepted standards of decency of conduct to which government must adhere. The manufacture or creation of a crime by law enforcement authorities cannot be tolerated.

The undisputed evidence in this case shows that law enforcement officers, without authorization by law, provided the cocaine that formed the basis for Kummer's prosecution. Therefore, we conclude that Kummer has established entrapment as a matter of law.

Accordingly, we reverse the conviction and remand for entry of a judgment of acquittal.

ERICKSTAD, C.J., and VERNON R. PEDERSON, Surrogate Judge, concur.

LEVINE, J., concurs in the result.

VERNON R. PEDERSON, Surrogate Judge, sitting due to the resignation of the Honorable H. F. GIERKE III.

VANDE WALLE, Justice, concurring specially.

The conduct of the law enforcement officers was unauthorized and illegal. I agree with the majority opinion that as a result of that unauthorized and illegal conduct, the conviction of Kummer for possession of a controlled substance with intent to deliver should be reversed.

I concur in the result, not because Kummer was "entrapped" within the meaning of section 12.1–05–11, NDCC, but because the actions of the law enforcement officers were contrary to public policy and perhaps violated the due process rights of Kummer. Indeed, before the trial court and this court Kummer and the State did not argue nor brief the issue of the actions of the law enforcement officers in the manner in which the majority opinion disposes of this issue; rather, because of the wording of section 12.1–05–11(2), NDCC, Kummer argued it "is our position that the wording of the statute is not in accordance with the original intent of the objective test of entrapment." Kummer thus contended that "the phrase should not be 'normally law-abiding citizens' but 'reasonable man' or 'person at large who would not otherwise have done so.' A normally law-abiding person indicates a person who would *never* commit an offense of any law. This is not the standard originally intended." [1]

It is understandable Kummer believed it was necessary to attempt to somehow change the statutory standard for entrapment in order that he be able to urge upon the court the unacceptable behavior of the law enforcement officers as a matter of law. I cannot fathom why a law enforcement officer who, undercover, offers to sell

---

**1.** Kummer alleges that the use of the phrase "otherwise normally law abiding person" in section 12.1–05–11, NDCC, "is not in accordance with the original intent of the objective test of entrapment" which "was intended to focus on whether the law enforcement agent's methods 'were so reprehensible under the circumstances, that the court should refuse, as a matter of public policy, to permit the judgment to stand.'" Insofar as our statutory entrapment defense may be more limited than the "original" objective standard, it enforces my belief that an attempt at a traditional entrapment analysis is injudicious.

narcotics, induces the commission of an offense by persuasion or other means likely to cause normally law abiding persons to commit the offense anymore than if the defendant is offered narcotics by someone not a law enforcement officer. The defendant does not know that either seller is an undercover agent. To assume, as a matter of law, that a defendant who is normally law abiding will purchase from a person who is an undercover agent but would not purchase from a seller who is not an undercover agent is disingenuous at best.

Nevertheless, as noted by the majority opinion, a number of jurisdictions have adopted this tortured rationale. The logic of it escapes me, particularly in those jurisdictions which have adopted an "objective" standard for entrapment similar to that of North Dakota. The only explanation I can offer for this seemingly unwarranted leap in logic is that the courts, having determined that the actions of law enforcement officers were unacceptable as a matter of public policy, believed it necessary to cast their opinions in more traditional and, perhaps, more tenable forms such as entrapment.

But rather than confuse what heretofore has been a clear judicial exposition of a clear legislative statute on the law of entrapment by attempting to tug and stretch the concept of entrapment so that it fits our view of the case, I believe we should confront the issue directly and declare that as a matter of public policy we will not sustain a conviction obtained by intolerable conduct on the part of law enforcement agents, notwithstanding the entrapment statute. That is a neater and more candid position for this court.[2] It is supported by the decision in United States v. West, 511 F.2d 1083, 1086 (1975). There, although reaching the same result "if the entrapment aspect of this case is analyzed as depending solely on the predisposition of [the defendant] to engage in illicit drug traffic," the court first analyzed the issue in the language cited by Justice Meschke in the majority opinion and concluded that the

court "view(ed) [the defendant's] case as one of intolerable conduct by government agents...." The same theme is apparent in many of the cases cited by the majority opinion. See e.g., Hampton v. United States, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) [majority concludes that outrageous police conduct may bar conviction as a matter of law]; Evans v. State, 550 P.2d 830 (Alaska 1976). It is on the basis of intolerable conduct, rather than an awkward application of the entrapment statute, that I agree with the majority's reversal of Kummer's conviction.

VERNON R. PEDERSON, Surrogate Judge, concurring specially.

This court has not been given much information relating to the police justification for "targeting" Kummer. Because the North Dakota entrapment law employs the "objective" theory, it is not unusual that we learn so little about Kummer's "predisposition" to commit any crime. Kummer, under our law, was entitled to be treated as a "normally law-abiding person" because he raised the entrapment defense. NDCC § 12.1–05–11(2).

I believe, however, that ordinarily the police can and must use dirty tricks to trap "predisposed" traffickers in illicit drugs. I agree that police, as a matter of law, should not be permitted to use confiscated substances to induce a "normally law-abiding person" to commit a crime.

In State v. Folk, 278 N.W.2d 410, 414 (N.D.1979), we said:

"No doubt a meritorious case can be made for the proposition that a defense which diverts the juror's attention away from the defendant and onto the police is designed to benefit a professional criminal, but is a detriment to a beginner who may be gullible to the wiles of a worldly and conniving, confidence-type, undercover agent."

I believe that it is time for the legislature to take a second look at the entrapment

---

**2.** This stance also avoids the embarrassing explanation of how the affirmative defense of entrapment, which we have heretofore held

presents a jury question, [State v. Kluck 340 N.W.2d 446 (1983)] is transformed into a "matter of law."

statute and redesign it to benefit "normally law-abiding persons" and give police authority to engage the "predisposed" professional criminal in a battle of "no holds barred."